2003 WY 68

John E. McGEE and Betty A. McGee Trustees of the McGee Mineral Trust dated January 15, 1992, and Allen Clark, a/k/a Melvin Allen Clark, Appellants (Plaintiffs),

v.

CABALLO COAL COMPANY, Appellee (Defendant).

No. 02–109.

Supreme Court of Wyoming.

May 29, 2003.

Charles R. Hart of Hart & Beisher, Sheridan, WY, Representing Appellants.

Dan B. Riggs of Lonabaugh and Riggs, Sheridan, WY, Representing Appellee.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

LEHMAN, Justice.

[¶ 1] This is an appeal from summary judgment entered in favor of appellee Caballo Coal Company (CCC) and against appellants John E. McGee and Betty A. McGee, Trustees of the McGee Mineral Trust dated January 15, 1992, and Allen Clark (collectively appellants). In granting summary judgment, the district court ruled that appellants' predecessors had conveyed the rights to coalbed methane gas (CBM) when they transferred certain real property located in the Fort Union formation of the Powder River Basin of Wyoming to CCC's predecessors. Upon review, we reverse.

### ISSUE

[¶ 2] Appellants present the following issue:

Does a conveyance of "all coal and all other minerals ... contained in or associated with coal and which may be mined and produced with coal which Grantor owns or holds in said lands" convey

coalbed methane gas, or does a reservation of "oil, gas and other minerals" reserve coalbed methane gas?

CCC styles the issue before this court as:

> Did the 1973 warranty deed between McGees and Carter Oil Company and the 1973 warranty deed between Clarks and Carter Oil Company convey coalbed methane underlying the described lands?

## FACTS

[¶ 3] On December 17, 1973, John E. McGee and Betty A. McGee issued a warranty deed conveying to Carter Oil Company the surface estate and any interests in coal that they may have or hold in certain real property located in Campbell County for an amount of $340,000.00 and a two percent per ton royalty on certain mined coal. The McGees did not own any coal rights with respect to this land because these rights had been reserved to the United States in the original patents. On this same date, Melvin D. and Ethel L. Clark conveyed to the Carter Oil Company, also via warranty deed, the surface estate in other real property for $1,510,000.00 but reserved the coal rights in this land. These warranty deeds were issued pursuant to prior agreements.

[¶ 4] Pertinent parts of the agreements set forth:

> Grantor agrees to grant and convey good and merchantable title to said lands to Grantee ... together with all coal and all other minerals metallic or non-metallic, contained in or associated with coal and which may be mined and produced with coal which Grantor owns or holds in said lands[.] ... [E]xcepting and reserving to Grantor all oil, gas, and other minerals in said lands which Grantor now holds, other than those specified above to be conveyed to Grantee and excepting all coal in the SE ¼ of Sec. 5, Township 48 North, Range 70 West [NE¼NE¼ of Section 24, Township 48 North, Range 71 West].

The warranty deeds both state in applicable part:

> ... hereby releasing and waiving all rights [to the lands described above] together with all coal and all other minerals, metallic or nonmetallic, contained in or associated with coal and which may be produced with coal which Grantor owns or holds in said lands[.] ... EXCEPTING AND RESERVING to Grantor all oil, gas and other minerals in said lands which Grantor now owns, other than those included above in the conveyance to Grantee, and excepting all coal in the SE¼ of Sec. 5, Township 48 North, Range 70 West [NE¼NE¼ of Section 24, Township 48 North, Range 71 West].

Further, the warranty deeds contain a nonmerger clause which states: "This deed is executed pursuant to agreement between Grantor and Grantee dated December 17, 1973, the provisions of which are not merged herein."

[¶ 5] Appellants are the successors in interest to John E. and Betty A. McGee and Melvin D. and Ethel L. Clark, while CCC is the successor in interest of Carter Oil Company. On June 21, 2001, appellants filed a declaratory judgment and quiet title action seeking a determination that the McGees and Clarks reserved CBM with respect to the warranty deeds. The parties then filed cross-motions for summary judgment. Upon consideration and hearing, the district court entered summary judgment in favor of CCC and against appellants. This appeal followed.

## STANDARD OF REVIEW

[¶ 6] Our standard of review in summary judgment cases is well established.

> Summary judgment motions are determined under the following language from W.R.C.P. 56(c):

> > The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

> The purpose of summary judgment is to dispose of suits before trial that present no genuine issue of material fact. *Moore v. Kiljander,* 604 P.2d 204, 207 (Wyo.

1979). Summary judgment is a drastic remedy designed to pierce the formal allegations and reach the merits of the controversy, but only where no genuine issue of material fact is present. *Weaver v. Blue Cross–Blue Shield of Wyoming*, 609 P.2d 984, 986 (Wyo.1980). A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. *Schuler v. Community First Nat. Bank*, 999 P.2d 1303, 1304 (Wyo.2000). The summary judgment movant has the initial burden of establishing by admissible evidence a prima facie case; once this is accomplished, the burden shifts and the opposing party must present specific facts showing that there is a genuine issue of material fact. *Boehm v. Cody Country Chamber of Commerce*, 748 P.2d 704, 710 (Wyo.1987); *Gennings v. First Nat. Bank of Thermopolis*, 654 P.2d 154, 156 (Wyo. 1982).

This Court reviews a summary judgment in the same light as the district court, using the same materials and following the same standards. *Unicorn Drilling, Inc. v. Heart Mountain Irr. Dist.*, 3 P.3d 857, 860 (Wyo.2000) (quoting *Gray v. Norwest Bank Wyoming, N.A.*, 984 P.2d 1088, 1091 (Wyo.1999)). The record is reviewed, however, from the vantage point most favorable to the party who opposed the motion, and this Court will give that party the benefit of all favorable inferences that may fairly be drawn from the record. *Garcia v. Lawson*, 928 P.2d 1164, 1166 (Wyo.1996).

*Garnett v. Coyle*, 2001 WY 94, ¶¶ 3–5, 33 P.3d 114, ¶¶ 3–5 (Wyo.2001).

### DISCUSSION

[¶ 7] Initially, we recognize that the facts and issue presented in this case are akin to those which existed in the case of *Newman v. RAG Wyoming Land Co.*, 2002 WY 132, 53 P.3d 540 (Wyo.2002), recently before this court. In *Newman*, we considered whether or not CBM had been conveyed or reserved by landowners in a 1974 land conveyance. In *Newman*, the grantors owned both the surface and mineral estate in certain Campbell County property and deeded the surface of such property and "coal and minerals commingled with [the] coal" to a neighboring coal mine operator reserving all "oil, gas, and other minerals" not otherwise conveyed. *Newman*, at ¶ 1.

[¶ 8] In *Newman*, we began our analysis by setting forth the historical background of CBM. In particular, this court recognized that CBM had been well known for over a century and had long been considered a dangerous waste product of coal mining until the 1970s. At that time, the value of CBM was realized resulting in concerted research and development in the area through the issuance of government grants. Nevertheless, it was not until the early 1990s that techniques were perfected for the efficient development of CBM. Prior to this time, CBM was simply allowed to escape from the coal in the course of open pit surface mining, and no attempt was made to capture it as a valuable resource. *Newman*, at ¶¶ 6–8.

[¶ 9] *Newman* further explored the chemistry and composition of CBM. In doing so, we recognized that CBM is chemically identical ($CH_4$) to gas produced through conventional methods. Both CBM and gas produced from conventional methods are known as "natural gas" and emanate from the decay of organic material over time under great pressure and temperature. CBM gas exists in coal in three basic states: as free gas; as gas dissolved in the water in coal; and as gas "absorbed" on the solid surface of the coal. *Newman*, at ¶ 9. Many of these facts are also established in this case through the affidavit of Jimmy Goolsby, a consulting geologist, submitted by appellants in support of their summary judgment motion and the affidavit of Anthony W. Gorody, an earth science professional, proffered by CCC in support of its motion for summary judgment.

[¶ 10] Finally, this court explained that the ultimate issue to be resolved in *Newman* was whether the parties to the deed in question intended CBM to be conveyed along with the coal estate or reserved to the grantor as part of the oil and gas estate. *Newman*, at ¶¶ 11 and 14. We are faced with exactly the same conclusive issue in this case.

[¶ 11] In making such a determination, we apply the following standards:

"According to our established standards for interpretation of contracts, the words used in the contract are afforded the plain meaning that a reasonable person would give to them. When the provisions in the contract are clear and unambiguous, the court looks only to the 'four corners' of the document in arriving at the intent of the parties. In the absence of any ambiguity, the contract will be enforced according to its terms because no construction is appropriate." *Amoco Production Company v. EM Nominee Partnership Company*, 2 P.3d 534, 539–40 (Wyo.2000) (citations omitted).

Assignments are contracts and are construed according to the rules of contract interpretation. The determination of the parties' intent is our prime focus in interpreting or construing a contract. If an agreement is in writing and its language is clear and unambiguous, the parties' intention is to be secured from the words of the agreement. When the agreement's language is clear and unambiguous, we consider the writing as a whole, taking into account relationships between various parts. *In interpreting unambiguous contracts involving mineral interests, we have consistently looked to surrounding circumstances, facts showing the relations of the parties, the subject matter of the contract, and the apparent purpose of making the contract.*

*Boley v. Greenough*, 2001 WY 47, ¶¶ 10–11, 22 P.3d 854, ¶¶ 10–11 (2001) (some citations omitted). Although substantial disagreement exists over the meaning of the deed, neither party suggests the language of the deed is ambiguous. Differing interpretations of contracts alone do not constitute ambiguity requiring extrinsic evidence. *Moncrief v. Louisiana Land and Exploration Company*, 861 P.2d 516, 524 (Wyo.1993).

We must first examine the terms of the deed and give them their plain and ordinary meaning. *Wolter v. Equitable Resources Energy Company, Western Region*, 979 P.2d 948, 951 (Wyo.1999); *Pete Lien & Sons, Inc. v. Ellsworth Peck Construction Co.*, 896 P.2d 761, 763 (Wyo. 1995). Plain meaning is that "meaning which [the] language would convey to reasonable persons at the time and place of its use." *Moncrief*, 861 P.2d at 524.

*Newman*, at ¶¶ 11–12 (emphasis added). *See also Wadi Petroleum, Inc. v. Ultra Resources, Inc.*, 2003 WY 41, ¶ 11, 65 P.3d 703, ¶ 11 (Wyo.2003). We also recognized in *Newman*, at ¶¶ 19 and 27, when faced with circumstances like those present here, we must focus on the general intent of the parties, concentrating on the purpose of the grant in terms of respective manner of enjoyment of surface and mineral estates and the exploitation of the mineral resources involved.

[¶ 12] The language of the warranty deeds in this case convey good and merchantable title to the lands involved "together with all coal and all other minerals, metallic or non-metallic, contained in or associated with coal and which may be produced with coal" owned or held by the grantors in those lands. These warranty deeds also reserved to the grantors "all oil, gas and other minerals in said lands" which the grantors then owned, "other than those included above in the conveyance to Grantee." One of the two warranty deeds also reserved "all coal" in the involved piece of real property, preserving such rights in the grantors. The language utilized in the agreements entered into between the parties varies slightly from that utilized in the warranty deeds by specifying that the grantors would grant and convey good and merchantable title to the lands "together with all coal and all other minerals metallic or non-metallic, contained in or associated with coal and which may be *mined and* produced with coal" which grantors owned or held in such lands.[1]

1. We again recognize that the warranty deeds contain a non-merger clause which states, "[t]his deed is executed pursuant to agreement between Grantor and Grantee dated December 17, 1973, the provisions of which are not merged herein." Nevertheless, we consider this language contained within the agreements in making our review of the surrounding circumstances, facts

[¶ 13] As in *Newman,* we start by concluding that CBM is a mineral under Wyoming law. *Newman,* at ¶ 13 and those cases cited therein. However, like *Newman,* this conclusion does little to resolve the dispute before us because "minerals" are both granted and reserved. Likewise, it is clear that CBM is contained in or associated with coal. As noted above, CBM exists in coal in three basic states. *Newman,* at ¶ 9. Expert testimony in this case, submitted by both parties via affidavits, establishes this. These affidavits were consistent and not in dispute. Dr. Gorody specified that CBM can be "physically absorbed onto the surface area of the coal matrix, and is an integral part of the organic coal structure," that CBM "is contained in each coal seam of the Fort Union formation," and that CBM "is physically trapped in the coal seams of the Fort Union formation ..." The affidavit of Dr. Goolsby further confirms this fact. *In accord see Amoco Prod. Co. v. Southern Ute Indian Tribe,* 526 U.S. 865, 873, 119 S.Ct. 1719, 1724, 144 L.Ed.2d 22 (1999); *Carbon County v. Union Reserve Coal Co.,* 271 Mont. 459, 898 P.2d 680, 683 (1995); *United States Steel Corp. v. Hoge,* 503 Pa. 140, 468 A.2d 1380, 1382 (1983).

[¶ 14] However, we are faced with a somewhat more difficult proposition when determining whether CBM "may be *mined and produced with coal*" as specified within the warranty deeds and agreements at issue. Obviously, these terms must be given their plain and ordinary meaning to reasonable persons at the same time and place of their use-namely, 1973 in the Fort Union formation of the Powder River Basin of Wyoming.

[¶ 15] In *Newman,* this court was faced with a similar determination in rendering a conclusion as to whether or not CBM "may be mined or extracted in association" with coal or "in conjunction with coal mining operations." *Newman,* at ¶¶ 15–18. In that case, we stated:

> The coal operator argues that production of gas has been considered "mining" relying on *Coronado Oil Company v. Grieves,* 603 P.2d 406 (Wyo.1979), *Amoco Production Company v. Guild Trust,* 636 F.2d

261, 263–65 (10th Cir.1980), and the language of oil and gas leases, including those issued by the landowners in this case. While those references certainly establish that oil and gas production through the drilling of wells has been considered "mining," they do not answer the question posed in this case because all agree that, in 1974 when the warranty deed in question was drawn, any gas found in the coal seam was not mined through a well bore but was ventilated or wasted while the coal was produced by excavation in the course of surface mining. In addition, the minerals conveyed by the language of the deed were only those mined "in association therewith or in conjunction with such coal operations." Webster's New World Dictionary confirms the ordinary meaning of "in association" and "in conjunction" to be "together." No party contends coalbed methane is somehow captured together with the coal as it is mined. Rather, it is released and escapes during the mining process. *Southern Ute Indian Tribe,* 526 U.S. at 873, 119 S.Ct. 1719. In the case of underground mines, it must be ventilated. *United States Steel Corporation v. Hoge,* 503 Pa. 140, 468 A.2d 1380, 1382 (1983).

Is the plain meaning of "extracted" the same as "released," "escaped," or "ventilated"? It is obvious these words connote different actions, and the distinctions between them are crucial to determining the intent of the parties to this deed. Webster's New World Dictionary confirms that difference by defining (1) "extract" as "to draw out by effort; pull out" and "to remove or separate (metal) from ore"; (2) "release" as "to set free"; and (3) "ventilate" as "to provide with an opening for the escape of air, gas, etc." Under the plain meaning of the terms chosen by the parties to the deed, we cannot conclude they intended to include coalbed methane gas as a mineral "mined or extracted in association therewith or in conjunction with such coal operations" when it can only be produced through wells as any other gas.

showing the relations of the parties, the subject matter of the contract, and the apparent purpose

of making the contract as required under our applicable standard of review.

We could end the inquiry at this point. However, because of the importance of the issue of the ownership of coalbed methane in general and the extensive consideration of this issue by other courts and commentators which we find helpful and consistent with our initial conclusion, further discussion is warranted.

The coal operator poses a creative argument suggesting that, because coalbed methane can most efficiently be produced in advance of the mining operations thereby reducing the water the mine must contend with and making the mine more economically successful, it is mined or extracted "in association therewith" or "in conjunction with" coal mining operations. Two problems exist with that argument. First, the gas production does not occur automatically in the process of overburden and coal excavation and removal. Instead, it only occurs when and if the coal operator decides to undertake gas well drilling in advance of the mine face. Second, such "mining" techniques—the coordination of well drilling and mine excavation—did not exist until twenty years after the deed in question was drawn which poses the broader question in this case. How is the parties' intent to be determined when minerals become valuable long after a conveyance by (1) discovery of new methods of production; (2) changes in economics making production of a previously known, but unwanted, mineral profitable; (3) or discovery of the presence of minerals not previously known to exist? Obviously, the language of the particular documents involved affects the answer to this question on a case-by-case basis.

*Id.* (footnote omitted.)

[¶ 16] CCC, like the coal operator in *Newman,* contends that CBM is "mined" as a matter of law and industry usage because CBM can be extracted through a well bore. In support of this contention, CCC cites the cases of *Coronado Oil Co. v. Grieves,* 603 P.2d 406, 411 (Wyo.1979), *Amoco Prod. Co. v. Guild Trust,* 636 F.2d 261, 265 (10th Cir.1980) and *City of Evanston v. Robinson,* 702 P.2d 1283, 1286 (Wyo.1985), along with Wyo. Const. art. 15, § 3; Wyo. Stat. Ann. § 39–13–102; and Williams and Meyers, *Manual of Oil and Gas Terms* 477 (11th ed. Lexis 2000). While oil and gas production through a well bore has been considered "mining," utilizing the same reasoning expressed in *Newman* quoted above, we must disagree such mining occurs "in conjunction with" or "in association" with the mining of coal.

[¶ 17] Moreover, our conclusion is supported by the expert affidavits of both Dr. Goolsby and Dr. Gorody submitted by the parties. In explaining the methods used to obtain CBM for sale commercially, Dr. Goolsby states:

All gas wells, whether drilled into sandstone, limestone, or other types of reservoir rock at any depth rely on a pressure differential to bring the gas into the well bore. The bore hole of any type of gas well serves as an escape route for gas under pressure to flow towards the surface. The pressure differential can be natural, caused by gravity, or it can be created by injecting water or carbon dioxide into gas holding formations. Likewise, the pressure differential can be achieved by removing or producing water from the gas well. Regardless of the method of exploiting or creating the pressure differential, all gas wells rely on this pressure differential. An accurate description of the production method for coalbed methane gas in the Powder River Basin is contained in the State of Wyoming Geological Survey's Information Pamphlet 7 (revised) entitled *Coalbed Methane in Wyoming* by Rodney DeBruin, Robert Lyman, Richard Jones and Lance Cook."

Dr. Goolsby continues,

Coal is mined by breaking it up and removing it from the earth with machinery. In the Powder River Basin in Wyoming and Montana, coal is removed by a process of open pit mining. This process does not allow the economic capture of coalbed methane gas. Rather, as the coal seam is exposed, and removed, essentially all of the coalbed methane gas is dissipated into the atmosphere. Only an infinitesimal amount of coalbed methane gas remains in

the coal after production. With current technologies, there is no way to economically recover coalbed methane gas from coal during or after it has been removed from the earth.

Dr. Goolsby then concludes that he knows of no method whereby coalbed methane may be mined and produced when excavating coal so that CBM may be sold or have any commercial value.

[¶ 18] Dr. Gorody similarly indicates in his affidavit that CBM is inevitably present during the normal process of coal extraction because the decrease in pressure within the coal seam naturally causes CBM to be released from the coal. Dr. Gorody further clarifies that CBM is extracted from the coal seams in the Fort Union formation by lowering the hydrostatic pressure immediately surrounding the coal matrix and that the removal of water to recover CBM is a mining process. In addition, Dr. Gorody details:

Unconventional coalbed methane gas is physically trapped in the coal seams of the Fort Union formation and cannot be released until mined or extracted. The mining and extraction method generally employed by producers proceeds as follows. First, a well is drilled to the top of the Wyodak Anderson coal seam. Drilling is discontinued as soon as this thick coal seam (usually 75 to 200 feet thick) is reached. A steel casing string is then set and cemented in each well. Once the cement has set, drilling is resumed, and the coal seam interval is drilled until the base of the coal is reached. The interval between the base of the casing and the base of the coal is usually left encased, or "open hole." Accordingly, there are no other geological strata exposed in the well bore that could provide access to either water or gas. This confirms that coalbed methane is produced only from the coal seam and not from a different geological horizon.

[¶ 19] These statements confirm our recognition in *Newman* that the capture of CBM for commercial purposes does not occur automatically in the process of overburden and coal excavation and removal. It only occurs when and if the coal operator decides to undertake gas well drilling in advance of mining the

actual coal. *Newman,* at ¶ 18. Therefore, we conclude, as we did in *Newman,* that given the plain meaning of the terms used in the subject agreements, the parties here did not intend to include CBM as a mineral "mined" with coal, as CBM can only be captured through the use of wells, as any other gas.

[¶ 20] Citing the expert affidavits submitted as noted above, CCC further argues that CBM is produced with coal. Indeed, CCC tenders that not only may CBM be produced with coal, it is impossible to prevent such production because it is a scientific fact that CBM is inevitably produced during the normal process of coal extraction as the decrease in pressure within the coal seam naturally causes CBM to be released from the coal. Further, in support of this argument, CCC points out that Webster's Ninth New Collegiate Dictionary defines the term "produced" as "to offer to view or notice [or] to give birth or rise to," which it asserts is consistent with its expressed position.

[¶ 21] We note that in rendering summary judgment in favor of CCC, the district court placed significance on the fact that given future technological advancements and developments, CBM "may" be mined and produced with coal when wells are drilled in advance of the mine face. However, this reasoning is effectively thwarted and must be considered inappropriate when it is recognized that the parties in 1973 clearly could not have had this manner of production in mind because it only became known long after the conveyance.

[¶ 22] We also question whether CBM can be mined and produced *with* coal as expressed in both the warranty deeds and the agreements. Webster's Third New International Dictionary, Unabridged, defines the word "with" as "2a) alongside of; near to ... c) in the same direction ... 4c) in respect to: so far as concerns ... 7d) as a result of; ... because of ... 9d) at the same time as ..." Thus, as utilized in context with the circumstances faced by the parties, we hold that the word "with," as was the case in *Newman,* connotes the ordinary meaning of "in association," "in conjunction" or "together." Again, CBM is not captured together

with the coal as it is mined. Rather, it can only be captured prior to the mining process or it is released and escapes during the mining process. The most likely meaning of the word "with" as used by the parties, was meant to convey those minerals that could be actually mined together with coal. As CCC—like the coal operator in *Newman*—argues, common sense dictates that its predecessor, Carter Oil Company, intended to acquire and paid for all minerals that could be produced with the coal to avoid interference with its coal mining operations. We agree that was the grantee's likely intent, and certain minerals did exist which could have been produced with the coal and caused problems for the coal producer.

[¶ 23]   As expressed by Dr. Goolsby:

> I have considered the possible meaning of minerals contained in or associated with coal. Minerals contained in or associated with coal include pyrite, marcasite, and calcium carbonate. In 1975 I was employed mapping coal deposits in Wyoming for the U.S. Geological Survey. At that time there was a rumor that small traces of gold were or might be present in coal deposits.

However, CBM was not produced "with" the coal either in 1974 or today. In fact, in 1974, it was considered a waste product and a safety hazard. For similar reasons, it does not make sense that Carter Oil Company intended to purchase CBM in order to negate any liability for its release. Indeed, we provided in *Newman* at ¶ 30:

> The coal operator strenuously argues the broad language of the warranty deed, "coal and minerals commingled with [the] coal," was intended to allow it to release the coalbed methane during the mining operation without liability. However, as noted by the Supreme Court:
>
> > The right to dissipate the CBM gas where reasonable and necessary to mine the coal does not, however, imply the ownership of the gas in the first instance. Rather, it simply reflects the established common-law right of the owner of one mineral estate to use, and even damage, a neighboring estate as

necessary and reasonable to the extraction of his own minerals.

> > *Southern Ute Indian Tribe,* 526 U.S. at 879, 119 S.Ct. 1719 (citing *Williams v. Gibson,* 84 Ala. 228, 4 So. 350 (1888); Rocky Mountain Mineral Law Foundation, 6 American Law of Mining § 200.04 (2d ed.1997)). Other courts which have considered this issue agree the right to ventilate gas, which is an essential element of the right to mine, is not equivalent to ownership. *NCNB Texas National Bank, N.A.,* 631 So.2d at 226. No one questions the coal owner's right to ventilate coalbed methane in the course of mining. "The grant of coal mining rights would be useless if it did not include the right to ventilate methane gas from the coal mining area." *Id.* at 228.

Furthermore, in this case with respect to one of the deeds, CCC cannot argue the grantee intended to protect its right to mine the coal because the coal owned by the grantor was specifically reserved and not conveyed. Thus, no potential for interference with the coal mining existed in any case.

[¶ 24]   Finally, the McGees and Clarks expressly reserved "all oil, gas and other minerals in said lands which Grantor now owns, other than those included above in the conveyance to Grantee." Thus the only specific mention of the mineral "gas" is contained in the reservation. As we expressed in *Newman* at ¶ 32:

> On the basis of the unambiguous language of the deed and the surrounding facts and circumstances, we conclude the parties generally intended the coal to be conveyed and the gas, wherever it may be located within the property, to be reserved to the landowners. Coalbed methane, being a gas, remained the landowners' property. By this ruling, we do not intend to imply that, in all circumstances, the conveyance of coal excludes the conveyance of the coalbed methane. Parties can certainly sever the coalbed methane from the remainder of the oil and gas estate and convey it separately. Such an explicit severance occurred in this case when the oil and gas lessee vertically segregated its oil and gas leasehold interest and assigned

from the surface to 1,000 feet beneath the surface, which contained the coal seam, to Hi Pro. However, the warranty deed from the landowners to the coal operator in this case, which conveyed "all coal and minerals commingled with coal that may be mined or extracted in association therewith or in conjunction with such coal operations" but reserved all oil and gas, did not accomplish such a segregation.

## CONCLUSION

[¶ 25]   We hold that the district court improperly determined that summary judgment should be granted to CCC. The record before us does not present issues of material fact, and the warranty deeds are not ambiguous. Moreover, the undisputed facts in this case establish that appellants' predecessors could not have intended to convey CBM to CCC's predecessors, as the identity, value, or feasibility of production of CBM was unknown at the time of the conveyance and, therefore, appellants' predecessors likely had no intent at all with regard to the CBM in question. Thus, appellants are entitled to summary judgment as a matter of law, rather than CCC.

[¶ 26]   Reversed.