2005 WY 17

Penny HOFLUND, Appellant (Plaintiff),

v.

AIRPORT GOLF CLUB, a Wyoming non-profit corporation, and Amos Midgely, Appellees (Defendant).

No. 04–12.

Supreme Court of Wyoming.

Feb. 10, 2005.

Representing Appellant: Loretta R. Green and Curtis B. Buchhammer of Buchhammer & Kehl, PC, Cheyenne, WY. Argument by Ms. Green.

Representing Appellees: Gay Woodhouse and Lori L. Brand of Gay Woodhouse Law Office, PC, Cheyenne, WY. Argument by Ms. Woodhouse.

Before HILL, C.J., and GOLDEN, KITE, and VOIGT, JJ., and STEBNER, D.J.

STEBNER, District Judge, Retired.

[¶ 1] This is an appeal from summary judgment granted against appellant Penny Hoflund and in favor of appellee Airport Golf Club (AGC). In her complaint against AGC, Hoflund alleged causes of action for breach of contract, breach of the covenant of good faith and fair dealing, intentional infliction of emotional distress, and defamation.[1] We affirm.

## ISSUES

[¶ 2] Hoflund phrases the issues on appeal as:

I. [Hoflund] properly asserted a claim for retaliatory discharge in violation of public policy within the trial court.

 a. The Wyoming Fair Employment Practices Act of 1965, Wyo. Stat. § 27–9–101 et seq. does not provide a remedy for sexual harassment.

 b. Sexual harassment violates theories of public policy and [Hoflund] had no other remedy than civil litigation.

 c. A material question of fact exists as to [Hoflund's] allegation of retaliatory discharge.

II. The covenant of good faith and fair dealing is breached when a special relationship exists between an employer and employee and the employee is discharged to avoid compliance with a specified duty of the employer.

III. Intentional infliction of emotional distress is available to an employee where a hostile work environment has been fostered if that employee can demonstrate severe emotional distress due to the employment relationship itself.

AGC states the issues on appeal as:

I. [Hoflund] did not properly assert a claim for retaliatory discharge in her complaint and raises related issues for the first time on appeal.

A. The Wyoming Fair Employment Practices Act of 1965, Wyo. Stat. § 27–9–101 et seq. provides an adequate remedy for sexual discrimination as held in Allen v. Safeway Stores, 699 P.2d 277 (Wyo.1985) precluding an action for retaliatory discharge.

B. [Hoflund] failed to exhaust the administrative remedies promulgated by the Wyoming Department of Labor pursuant to Wyo. Stat. § 27–9–104(a)(ii) thus barring any claim of retaliatory discharge.

II. As a matter of law, no "special relationship of trust and reliance" existed between [Hoflund] and [AGC] sufficient to support a claim of violation of the covenant of good faith and fair dealing.

A. [Hoflund] provided no separate consideration to her employer [AGC] to establish the necessary special relationship of trust and reliance.

B. [Hoflund's] at-will employment status was not modified by [AGC's] voluntary adoption of a sexual harassment policy.

III. [AGC's] lawful termination of [Hoflund] cannot support a claim of intentional infliction of emotional distress against it as a matter of law, and [Hoflund] presented no other facts to support such a claim to the District Court.

## FACTS

[¶ 3] AGC is a nonprofit corporation that operates a private membership club including a restaurant and bar at the clubhouse of the Cheyenne Airport Municipal Golf Course. Hoflund began employment with AGC as a bartender in approximately 1993. Between 1996 and 1998 Hoflund acted as manager for AGC. In 1998, Hoflund returned to the position of bartender at her request until March of 2001. Hoflund then left the employ of AGC until June of 2001 when she was rehired by AGC serving in the capacity as

---

1. The district court later allowed Hoflund to imply a cause of action for retaliatory discharge through her first cause of action against AGC. Hoflund also asserted causes of action against Amos Midgely, an AGC employee, for assault and battery and intentional infliction of emotional distress. Default was entered against Midgely and he is not involved in this appeal. Hoflund does not appeal from the district court's ruling in favor of AGC concerning her asserted cause of action for defamation.

manager until March of 2002. Thereafter, Hoflund again left the employ of AGC to take another job, but filled in at the club when requested to do so. Hoflund was once more rehired full time by AGC in the position of bartender in June of 2002.

[¶ 4] When Hoflund returned to employment with AGC in June of 2002, Midgely was employed as a cook. Hoflund knew Midgely prior to his employment with AGC because Midgely had been an active member of the club for several years. While Midgely was a patron and Hoflund's co-worker at AGC, Hoflund and Midgely engaged in banter and verbal sparring.

[¶ 5] Hoflund, however, alleges that from June through August of 2002, Midgely made various inappropriate sexually explicit comments and gestures towards her, to which Hoflund objected. Hoflund reported some of these incidents to AGC. Hoflund then alleges that on August 23, 2002, when Hoflund was retrieving items from the kitchen, Midgely inappropriately touched her with a fly swatter. Hoflund again objected, but did not immediately report this incident to AGC. Later that same afternoon, Hoflund returned to the kitchen to retrieve something for a patron, where Midgely allegedly positioned himself behind Hoflund and when she turned around, grabbed her and made a sexually explicit statement.

[¶ 6] At the end of her shift, Hoflund informed AGC of the alleged encounters. Ultimately, Hoflund was asked to submit a written statement to AGC and AGC approached Midgely about the alleged occurrences, which he denied. Hoflund also discussed the alleged incidents with the Cheyenne Police Department but chose not to file an official complaint.

[¶ 7] On August 28, 2002, Hoflund appeared before the AGC board of directors and was advised that AGC had hired an independent investigator to look into the matter. At this time, Hoflund informed AGC that she was uncomfortable working if Midgely was present in the building. AGC then placed Midgely on administrative leave to facilitate a change in the work schedule. These changes resulted in Hoflund and Midgely working at different times. Both parties were advised that they could not make any changes to their assigned schedule without authorization.

[¶ 8] Ultimately, the results of the investigation were deemed inconclusive by AGC. However, AGC decided to adopt a written sexual harassment policy. This policy included a clause preventing retaliation against an individual reporting an allegation of sexual harassment. All AGC employees, including Hoflund and Midgely, were presented with the policy. Hoflund and Midgely were also instructed that if the other was working or already at the club for social purposes prior to their arrival, they were to leave the premises immediately.

[¶ 9] On September 12, 2002, and on a number of additional occasions thereafter, Midgely entered the restaurant of the club when Hoflund was working. AGC was informed of these occurrences. Hoflund decided to file a formal complaint with the Cheyenne Police Department concerning her alleged second encounter of August 23, 2002, with Midgely. On September 18, 2002, the Cheyenne Police Department served Midgely with a citation for rude and indecent behavior.

[¶ 10] At the end of her shift on September 20, 2002, Hoflund prepared her cash drawer statement as required. When doing so, she inaccurately stated that she had $200.00 worth of twenty-dollar bills when she actually had only one twenty-dollar bill in her cash drawer. The following day, Hoflund was questioned about this discrepancy by AGC. Eventually, Hoflund's mistake was realized and Hoflund was warned that errors of this nature were unacceptable to AGC. Hoflund had experienced previous similar issues concerning the balancing of her cash drawer and had been admonished by AGC. Confrontational and angry words were exchanged during the meeting, with Hoflund repeatedly asking if she was being fired. AGC then informed Hoflund that she was, in fact, being terminated.

[¶ 11] On December 10, 2002, Hoflund filed her complaint. Substantial discovery was completed and AGC filed its motion for summary judgment, which Hoflund opposed.

After the hearing, the district court granted summary judgment for AGC finding that Hoflund failed to provide any bargained-for consideration with respect to the enactment of the sexual harassment policy, thus her employment with AGC remained "at-will." Additionally, the district court determined that Hoflund failed to exhaust her administrative remedies with respect to any implied retaliatory discharge claim asserted in her first cause of action. The district court also found that no special relationship existed between Hoflund and AGC and, therefore, Hoflund could not assert a valid breach of the covenant of good faith and fair dealing cause of action. Finally, the district court ruled that because Hoflund's termination was lawful, she had no claim for intentional infliction of emotional distress and that Hoflund presented no facts to support her claim of defamation.[2] This appeal followed.

## STANDARD OF REVIEW

[¶ 12] In *Markstein v. Countryside I, L.L.C.*, 2003 WY 122, ¶ 11, 77 P.3d 389, ¶ 11 (Wyo.2003), we again set out our well-established standard for review of summary judgment cases. Therein, we stated:

Summary judgment motions are determined under the following language from W.R.C.P. 56(c):

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The purpose of summary judgment is to dispose of suits before trial that present no genuine issue of material fact. *Moore v. Kiljander*, 604 P.2d 204, 207 (Wyo.1979). Summary judgment is a drastic remedy designed to pierce the formal allegations and reach the merits of the controversy, but only where no genuine issue of material fact is present. *Weaver v. Blue Cross–Blue Shield of*

*Wyoming*, 609 P.2d 984, 986 (Wyo.1980). A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. *Schuler v. Community First Nat. Bank*, 999 P.2d 1303, 1304 (Wyo.2000). The summary judgment movant has the initial burden of establishing by admissible evidence a prima facie case; once this is accomplished, the burden shifts and the opposing party must present specific facts showing that there is a genuine issue of material fact. *Boehm v. Cody Country Chamber of Commerce*, 748 P.2d 704, 710 (Wyo. 1987); *Gennings v. First Nat. Bank of Thermopolis*, 654 P.2d 154, 156 (Wyo. 1982).

This Court reviews a summary judgment in the same light as the district court, using the same materials and following the same standards. *Unicorn Drilling, Inc. v. Heart Mountain Irr. Dist.*, 3 P.3d 857, 860 (Wyo.2000) (quoting *Gray v. Norwest Bank Wyoming, N.A.*, 984 P.2d 1088, 1091 (Wyo.1999)). The record is reviewed, however, from the vantage point most favorable to the party who opposed the motion, and this Court will give that party the benefit of all favorable inferences that may fairly be drawn from the record. *Garcia v. Lawson*, 928 P.2d 1164, 1166 (Wyo.1996). *McGee v. Caballo Coal Co.*, 2003 WY 68, ¶ 6, 69 P.3d 908, ¶ 6 (Wyo.2003) (quoting *Garnett v. Coyle*, 2001 WY 94, ¶¶ 3–5, 33 P.3d 114, ¶¶ 3–5 (Wyo.2001)). We also recognized in *Mize v. North Big Horn Hosp. Dist.*, 931 P.2d 229, 232 (Wyo.1997) that little mystery remains concerning our willingness to dispose of cases via summary judgment, provided there is no genuine issue of material fact and the law clearly entitles the party to prevail.

## DISCUSSION

### Retaliatory Discharge

[¶ 13] As indicated previously, the district court found, in part, that Hoflund

2. Again, Hoflund does not appeal the district court's ruling concerning her claim of defamation against AGC.

failed to provide any bargained-for consideration with respect to the implementation of the sexual harassment policy, thus her employment with AGC remained "at-will." Hoflund disputes this holding and states that she did not mean to imply that a "for-cause" relationship was created by the enactment of the sexual harassment policy. Hoflund then asserts that the district court erred when it found that she failed to exhaust her administrative remedies with respect to her retaliatory discharge claim. In particular, Hoflund argues that she had no administrative remedy to exhaust. We do not agree.

[¶ 14] In *Allen v. Safeway Stores, Inc.*, 699 P.2d 277 (Wyo.1985), this Court made it clear that if another remedy for violation of a social policy which resulted in the discharge of an employee exists, no separate court action will lie. Therein, we stated:

> A tort action premised on violation of public policy results from a recognition that allowing a discharge to go unredressed would leave a valuable social policy to go unvindicated. If there exists another remedy for violation of the social policy which resulted in the discharge of the employee, there is no need for a court-imposed separate tort action premised on public policy. *Viestenz v. Fleming Companies, Inc.*, 681 F.2d 699 (10th Cir.1982), *cert. denied* 459 U.S. 972, 103 S.Ct. 303, 74 L.Ed.2d 284; *Mahoney v. Crocker National Bank*, 571 F.Supp. 287, (D.C.Cal.1983). As said in *Wehr v. Burroughs Corporation*, 438 F.Supp. 1052, 1055 (D.C.Pa.1977):
>
> "It is clear then that the whole rationale undergirding the public policy exception is the vindication or the protection of certain strong policies of the community. If these policies or goals are preserved by other remedies, then the public policy is sufficiently served. Therefore, application of the public policy exception requires two factors: (1) that the discharge violate some well-established public policy; and (2) that there be no remedy to protect the interest of the aggrieved employee or society." (Footnote omitted.)

The Wyoming Fair Employment Practices Act of 1965, § 27–9–101 et seq., W.S.1977 (June 1983 Replacement), and 42 U.S.C. § 2000e et seq. (1982) provide appellants with a remedy for discharge based on sex discrimination.

As noted in *Rompf v. John Q. Hammons Hotels, Inc.*,[685 P.2d 25 (Wyo.1984),] we restricted our holding to the parameters of that case. We do likewise here. Counsel cite cases in which tort actions premised on violations of public policies have been upheld; e.g., *Nees v. Hocks*, 272 Or. 210, 536 P.2d 512 (1975), discharge for serving on a jury; *Hansen v. Harrah's*, Nev., [100 Nev. 60] 675 P.2d 394 (1984); *Frampton v. Central Indiana Gas Company*, 260 Ind. 249, 297 N.E.2d 425, 63 A.L.R.3d 973 (1973), and *Murphy v. City of Topeka–Shawnee County Department of Labor Services*, 6 Kan.App.2d 488, 630 P.2d 186 (1981), discharge in retaliation for filing worker's compensation claims. Such cases are not similar to this case. The complaint in this case does not state a tort claim upon which relief could be granted against Safeway and Rock based on appellants' discharges from employment.

*Allen*, 699 P.2d at 284. In *Allen*, the Allens argued that even though their employment was "at will," their discharge was in violation of public policy and, therefore, they could assert a tort claim for damages. We concluded that both the Wyoming Fair Employment Practices Act (FEPA), Wyo. Stat. §§ 27–9–101 *et seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C.A.2000e *et seq.*, provided the Allens with a remedy for discrimination on the basis of sex. Thus, because these administrative processes set forth a specific procedure for processing the Allens' complaints and the Allens had not followed these procedures, the Allens could not recover through the courts. The same situation exists here.

[¶ 15] While it is unclear from the record if Hoflund could avail herself of the administrative process established by Title VII, Hoflund was able to seek administrative review through FEPA.[3] Indeed, Wyo. Stat. Ann.

---

3. Title VII requires that an employer employ at least 15 employees each day for a period of 20

weeks or more before a discriminatory charge may be investigated under that title through the

§ 27–9–104(iii) (LexisNexis 2003) requires the State of Wyoming, Department of Employment "to receive, investigate, and determine the validity of complaints alleging discrimination in employment or the existence of a discriminatory or unfair employment practice." Further, Wyo. Stat. Ann. § 27–9–105(a)(i) (LexisNexis 2003) (emphasis added) defines an employer's discharge of an employee because of age, *sex,* race, creed, color, national origin or ancestry as a discriminatory or unfair employment practice. Finally, Wyo. Stat. Ann. § 27–9–106 (LexisNexis 2003) provides that any person claiming to be aggrieved by a discriminatory or unfair employment practice may personally or through his/her attorney file a verified complaint.

[¶ 16] We also find unpersuasive Hoflund's argument that there exists a clear distinction between discrimination based on "sex," i.e., "gender," and sexual harassment and she therefore has no FEPA-based administrative claim. Initially, we note that Title VII prohibits discrimination on the basis of gender and the EEOC has issued guidelines which provide that sexual harassment, as defined therein, is a form of sexual discrimination prohibited by Title VII. 42 U.S.C.A. § 2000e–2(A)(1) (2003 and Supp. 2004) and 29 C.F.R. § 1604.11(a) (2004). Under these guidelines, sexual harassment falls into two categories: first, *quid pro quo* cases where the employee suffers a tangible job detriment as a result of the sexual harassment, and second, where the harassment creates an intimidating, hostile, or offensive work environment. 29 C.F.R. § 1604.11(a) (2004). Since the guidelines were issued, federal courts have uniformly held that sexual harassment is a violation of Title VII. *See Meritor Savings Bank v. Vinson,* 477 U.S. 57, 63–67, 106 S.Ct. 2399, 2403–06, 91 L.Ed.2d 49, 57–60 (1986) and cases cited therein. Moreover, the United States Supreme Court has stated that the guidelines of the EEOC "while not controlling upon the courts by reason of their authority, do consti-

tute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *General Electric Company v. Gilbert,* 429 U.S. 125, 141–42, 97 S.Ct. 401, 411, 50 L.Ed.2d 343, 357–58 (1976) (quoting *Skidmore v. Swift & Company,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124, 129 (1944)). Chapter III, Section 4(e) of the Rules and Regulations of the Labor & Statistics Program of the State of Wyoming, Department of Employment, Fair Employment Rules (2001) specifically provides that the Division may give substantial weight to the current guidelines of the EEOC.

[¶ 17] Many state courts have further determined that discrimination based on "sex" or "gender" includes sexual harassment. *Ritchie v. Department. of State Police,* 60 Mass.App.Ct. 655, 805 N.E.2d 54, 61 (2004); *Chambers v. Trettco, Inc.,* 463 Mich. 297, 614 N.W.2d 910, 917 (2000); *Cummings v. Koehnen,* 568 N.W.2d 418, 420–21 (Minn. 1997); *Sabella v. Manor Care, Inc.,* 121 N.M. 596, 915 P.2d 901, 902 n. 1 (1996); *Vincent v. West Texas State University,* 895 S.W.2d 469, 473 (Tex.App.-Amarillo 1995); *Accardi v. Superior Court,* 17 Cal.App.4th 341, 21 Cal.Rptr.2d 292, 296 (1993); *Lehmann v. Toys 'R' Us, Inc.,* 132 N.J. 587, 626 A.2d 445, 452 (1993); *Hammond v. Medical Arts Group, Inc.,* 574 So.2d 521, 523 (La.App. 3 Cir.1991); *Harrison v. Chance,* 244 Mont. 215, 797 P.2d 200, 203 (1990); *Old Ben Coal Company v. Illinois Human Rights Commission,* 150 Ill.App.3d 304, 103 Ill.Dec. 603, 501 N.E.2d 920, 923 (1986). Upon our review of FEPA, we reach the same conclusion. Indeed, common sense dictates that sexual harassment must be included as a subset of sexual discrimination to best promote the clear purpose of FEPA-to ensure equality and decency in the workplace.

[¶ 18] Hoflund, however, argues that in *Allen* this Court recognized a distinction between sexual discrimination and sexual harassment when we referenced *Monge v. Beebe Rubber Company,* 114 N.H. 130, 316

United States Equal Employment Opportunity Commission (EEOC). *See* 42 U.S.C.A. § 2000e–1 (2002 and Supp.2004). In this case, the record does not disclose if AGC qualified as an employer as defined under Title VII. However, AGC did meet the necessary requirements set forth by

FEPA that defines an "employer" as an entity that employs two or more individuals within the State of Wyoming because AGC, at minimum, employed both Hoflund and Midgely during the applicable time frame. *See* Wyo. Stat. Ann. § 27–9–102(b) (LexisNexis 2003).

A.2d 549 (1974). As Hoflund admits, the reference to *Monge* within *Allen*, 699 P.2d at 283, constitutes dicta. In *Allen*, this Court recognized that *Monge* was the only case cited by Ms. Allen to support her claims that her discharge was contrary to public policy against sex discrimination and public policy favoring the status of marriage. We then concluded that *Monge* was inapplicable because *Monge* dealt with a situation where an employee alleged that she was terminated for refusing to date and have sexual relations with her supervisor, or *quid pro quo* sexual harassment, which was much different than the circumstances presented by Ms. Allen's claims. This recognition does not negate our substantive holding in *Allen* that when there exists another remedy to address an alleged social policy violation, that remedy must be pursued rather than a tort action. *Allen*, 699 P.2d at 283–84. We have consistently held that the exhaustion of available administrative remedies must occur before judicial relief may be available. *Bender v. Greer*, 996 P.2d 671, 673 (Wyo.2000); *State ex rel. Baker v. Strange*, 960 P.2d 1016, 1019 (Wyo.1998); *Routh v. State ex rel. Workers' Compensation Division*, 952 P.2d 1108, 1115 (Wyo. 1998), *cert. denied*, 525 U.S. 814, 119 S.Ct. 49, 142 L.Ed.2d 38 (1998); *Wagoner v. State, Department of Administration & Information*, 924 P.2d 88, 91 (Wyo.1996); *State ex rel. Epp v. Mayor*, 894 P.2d 590 (Wyo.1995). In Wyoming, judicial action is withheld until the administrative process has run its course. *Bender*, 996 P.2d at 673; *Routh*, 952 P.2d at 1115 (both citing *Wagoner*, 924 P.2d at 91). Finally, insofar as *Allen* can be read to make a distinction between sexual discrimination and sexual harassment for purposes of investigation under FEPA, we abrogate any such holding.

██ [¶ 19] Hoflund also contends that the legislature's failure to specify that sexual harassment is within the purview of FEPA, while making numerous modifications to FEPA to include other topics such as age, disability, and tobacco usage, shows that the legislature does not intend sexual harassment to be covered under FEPA. We do not agree. As pointed out above, many courts, both federal and state, have conclusively determined over the years that discrimination based upon sex, i.e., gender, includes sexual harassment. Therefore, the modifications Hoflund suggests are not needed. It is presumed that the legislature is knowledgeable about the current state of the law with reference to other statutes and decisions of the courts. *Olsen v. State*, 2003 WY 46, ¶ 160, 67 P.3d 536, ¶ 160 (Wyo.2003); *Bertagnolli v. Louderback*, 2003 WY 50, ¶ 15, 67 P.3d 627, ¶ 15 (Wyo.2003); *Keats v. State*, 2003 WY 19, ¶ 32, 64 P.3d 104, ¶ 32 (Wyo.2003). Moreover, as noted above, common sense belies the conclusion that FEPA was enacted to combat discrimination on the basis of age, sex, race, creed, color, national origin, or ancestry as discriminatory or unfair employment practices while excepting sexual harassment.

### Breach of the Covenant of Good Faith and Fair Dealing

[¶ 20] Hoflund contends that a material question of fact remains regarding whether a special relationship existed between her and AGC. Hence, Hoflund asserts that the district court improperly concluded that no special relationship existed and, therefore, no valid breach of the covenant of good faith and fair dealing could be asserted by Hoflund. Essentially, Hoflund asserts that her long-term employment with AGC establishes her special relationship. Further, Hoflund argues that this relationship, coupled with AGC's motivation to terminate her from employment in order to avoid its responsibilities to comply with its own sexual harassment policy and additional assurances to her that sexual harassment in the work place would be addressed, establishes a valid cause of action for breach of the covenant of good faith and fair dealing. Again, we do not agree.

██ [¶ 21] This Court has established that only in limited circumstances will a breach of the covenant of good faith and fair dealing in an employment context become an actionable tort. Under Wyoming law, an employee must demonstrate a special relationship of trust and reliance before that employee can recover on an implied covenant of good faith and fair dealing claim. *Van-*

*Lente v. University of Wyoming Research Corporation,* 975 P.2d 594, 598 (Wyo.1999) (citing *Wilder v. Cody Country Chamber of Commerce,* 868 P.2d 211, 222 (Wyo.1994)). These situations are rare. *VanLente,* 975 P.2d at 598; *Worley v. Wyoming Bottling Company, Inc.,* 1 P.3d 615, 624 (Wyo.2000) (citing *Wilder,* 868 P.2d at 221). Usually, such a special relationship can be found only in a long-term employment relationship, coupled with a discharge calculated to avoid employer responsibilities to the employee. *VanLente,* 975 P.2d at 598 (citing *Wilder,* 868 P.2d at 221–22; and *Garcia v. UniWyo Federal Credit Union,* 920 P.2d 642, 646 (Wyo. 1996)). We have also stated that the trust and reliance necessary to give rise to a tort cause of action for breach of the covenant of good faith and fair dealing in an employment situation may be found by the existence of separate consideration, common law, statutory rights, or the existence of rights accruing with longevity of service. *VanLente,* 975 P.2d at 598 (citing *Loghry v. Unicover Corporation,* 927 P.2d 706, 712 (Wyo.1996); and *Worley,* 1 P.3d at 625). We have further acknowledged that whether a special relationship exists between an employer and an employee seeking recovery is normally "a question of fact, not a question of law, to be decided by the trier of fact **unless reasonable minds could not differ.**" *Worley,* 1 P.3d at 624 (emphasis added) (citing *Jewell v. North Big Horn Hospital District,* 953 P.2d 135, 139 (Wyo.1998)).

[¶ 22] The record evidences that Hoflund was employed with AGC over a seven-year period. However, such employment was intermittent, and Hoflund left full-time employment with AGC twice during this time frame. Most recently, Hoflund was employed with AGC for only a few months prior to her termination. In previous cases we have held that such a time period was insufficient to establish sufficient longevity. In *Trabing v. Kinko's, Inc.,* 2002 WY 171, ¶¶ 24–27, 57 P.3d 1248, ¶¶ 24–27 (Wyo.2002), affirming summary judgment, we stated:

> Trabing next asserts that her eight years of dedicated service to Kinko's along with the separate consideration of her dedication to outstanding customer service

that went above and beyond the call of duty created a special relationship of trust and reliance between herself and Kinko's and that Kinko's breached its duty to act in good faith and fair dealing when it terminated her employment. Kinko's replies that Trabing has failed to establish the requisite special relationship of trust and reliance for her breach of implied covenant of good faith and fair dealing claim.

> Kinko's is correct in its assertion that a special relationship of trust and reliance must be demonstrated before an employee can recover on an implied covenant of good faith and fair dealing claim. *VanLente v. University of Wyoming Research Corp.,* 975 P.2d 594, 598 (Wyo.1999). Previous Wyoming cases have indicated the type of factors that will give rise to a special relationship: separate consideration, common law, statutory rights, or the existence of rights accruing with longevity of service. *Worley,* 1 P.3d at 624.

> With regard to longevity of service, this court has stated that the mere longevity of service is not sufficient to create the special relationship leading to tort remedy. *VanLente,* 975 P.2d at 598. "Usually, the special relationship ... stems from a long term employment relationship coupled with a discharge calculated to avoid employer responsibilities to the employee, e.g., benefits or commissions." *Garcia v. UniWyo Federal Credit Union,* 920 P.2d 642, 646 (Wyo.1996). Trabing does not allege, nor does the evidence suggest, that Kinko's terminated her employment in order to avoid giving her any benefits that she earned during her employment. We, therefore, are not moved to find that Trabing's eight years of service to Kinko's created the special relationship necessary to sustain this type of claim.

> Trabing's assertion that her dedication to outstanding customer service constitutes additional consideration also fails to establish the special relationship requirement. Being dedicated to outstanding customer service was simply a part of her job as branch manager. Kinko's company policy states: "Our primary objective is to take care of our customer." To establish separate consideration, Trabing would have to

show that she provided something other than "merely performing the duties of the job." *Worley*, 1 P.3d at 626. Indeed, this court has specifically stated that "[l]ongevity, coupled with performance of job duties, is not sufficient to structure the special relationship required by *Wilder*." *VanLente*, 975 P.2d at 598. We hold that the facts of this case do not create a special relationship of trust and confidence necessary for Trabing to pursue a breach of the implied covenant of good faith and fair dealing claim. Kinko's was, therefore, entitled to a summary judgment on this issue.

Likewise, in *VanLente* we held that an employee's performance of his duties during a nine-year term of employment was insufficient to constitute a special relationship. Therein, we stated:

> VanLente contends that the relationship was one of "trust and reciprocal confidence with regard to extremely sensitive human resource policy and employment matters...." The relationship articulated by VanLente is simply one that is inherent in the duties of a human resources manager. It, therefore, was no more than one of the functions with which he was tasked, and did not arise from any special relationship as we have defined it. Longevity, coupled with performance of job duties, is not sufficient to structure the special relationship required by *Wilder*. Further, the record does not disclose any effort on the part of VanLente to demonstrate that the termination was driven by some motive to deprive him of the potential benefits. In light of this record, the district court correctly entered summary judgment in favor of the Institute and Speight on the alleged tort remedy of breach of the implied covenant of good faith and fair dealing.

*VanLente*, 975 P.2d at 598. Therefore, Hoflund is unable to show that she had been employed with AGC to meet any necessary longevity requirement.

[¶ 23] Even if the district court found that Hoflund had established longevity of service, longevity along with performance of duties, alone, is insufficient to find that a special relationship exists as a matter of law.

*Trabing*, ¶ 27. The record discloses that Hoflund did not present any evidence that she was terminated in violation of common law, statutory rights, or rights accruing with longevity of service. Hoflund did claim that separate consideration existed, and that AGC terminated her employment in order to avoid enforcing AGC's sexual harassment policy and AGC's additional assurances to her that the alleged sexual harassment in the work place would be addressed. However, Hoflund admitted at deposition that she provided no bargained-for consideration to AGC in exchange for its implementation of the sexual harassment policy. The record further supports the fact that Hoflund never expressed her intention to quit employment if AGC did not promise to limit her contact with Midgely. By the same token, the accusations asserted by Hoflund that she was terminated by AGC so that AGC could deprive her of potential benefits is not supported by any substantiated facts.

### Intentional Infliction of Emotional Distress

[¶ 24] In her last argument, Hoflund asserts that material questions of fact exist concerning the cause of her emotional distress. In particular, she contends that material questions of fact exist as to whether her emotional distress was caused by the entirety of events that occurred surrounding the alleged interactions with Midgely and AGC's response. She further argues that a material question of fact exists concerning whether her termination may be characterized as a "legal termination." Thus, she concludes that the district court erred when it dismissed her cause of action for intentional infliction of emotional distress based on its ruling that her distress was solely caused and directly related to her lawful termination.

 [¶ 25] Hoflund testified at deposition that the alleged intentional outrageous conduct committed by AGC was principally its termination of her from its employment. Similarly, Dr. Sherry Welch stated that Hoflund generally attributed her distress to her termination. In *Trabing*, ¶¶ 28–30 (emphasis

added), this Court rejected a similar claim stating as follows:

> Trabing finally alleges that Kinko's termination of her employment based solely on the basis of her employees' anonymous and unsubstantiated comments during a time in which she was grieving over the recent loss of her mother caused her severe emotional distress. Kinko's responds that it was simply exercising its legal rights when it terminated Trabing's employment.
>
> Wyoming has acknowledged that certain conduct in employment situations may be outrageous enough to provide the terminated employee with a claim for intentional infliction of emotional distress. *Worley,* 1 P.3d at 628. We have adopted the tort as it is defined in the *Restatement, Second, Torts* § 46(1) (1965):
>
>> One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.
>
> *Worley,* 1 P.3d at 628. However, *if an employee's mental distress is caused solely by a termination that was permitted by the contract, then the employer has a complete defense even if the employer knows that the termination will cause the employee emotional distress.* Terry v. Pioneer Press, Inc., 947 P.2d 273, 278 (Wyo.1997).
>
> In light of our holding that Trabing's employment with Kinko's was at will, we find that Kinko's did nothing more than act within its legal rights when it terminated Trabing's employment. Accordingly, Kinko's has a complete defense to this claim, and summary judgment was appropriate.

[¶ 26] When Dr. Welch was questioned further, she stated that Hoflund's distress was principally caused by the combination of events that occurred while Hoflund was employed by AGC, namely, the alleged harassment incidents, her termination, and the subsequent litigation. Hoflund also argues that her distress was caused by the alleged sexual harassment. Midgely's alleged intentionally outrageous acts cannot be properly attributed to AGC in making a valid actionable claim against AGC for intentional infliction of emotional distress. Rather, such claims may only be asserted directly against Midgely, himself. Likewise, any distress caused by the litigation, itself, is non-actionable.

[¶ 27] This Court has clearly established that liability may be found only where the actions of a particular defendant may be characterized as . extreme and outrageous conduct.

> To recover under the tort of intentional infliction of emotional distress, the plaintiff must prove that the defendant acted in an extreme and outrageous manner and that the defendant intentionally or recklessly caused the plaintiff severe emotional harm. *Kanzler v. Renner,* 937 P.2d at 1341 (Wyo. 1997) (citing *R.D. v. W.H.,* 875 P.2d 26, 31 (Wyo.1994)). Comment d of the *Restatement, Second, Torts* § 46, which we have cited on numerous occasions, attempts to clarify the parameters of outrageous behavior. *See Hatch v. State Farm Fire and Cas. Co.,* 930 P.2d 382, 396 (Wyo.1997); *Spurlock v. Ely,* 707 P.2d 188, 192 (Wyo. 1985); *Garcia v. Lawson,* 928 P.2d 1164, 1168 (Wyo.1996) (Thomas, J., concurring specially); *Kanzler v. Renner,* 937 P.2d at 1341. We quote from that comment:
>
>> *Extreme and outrageous conduct.* The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse

his resentment against the actor, and lead him to exclaim, "Outrageous!"

The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam.

Both the court and the jury play a role in assessing the validity of a claim of outrageousness.

It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so. Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability.

*Kanzler v. Renner*, 937 P.2d at 1341 (quoting *Restatement, Second, Torts* § 46, cmt. h); *Leithead [v. American Colloid Co.]*, 721 P.2d [1059,] at 1066 [ (Wyo.1986) ].

*Worley*, 1 P.3d at 628.

[¶ 28] Further, the at-will employment doctrine is well recognized in Wyoming. This doctrine allows an employee or an employer to end the employment relationship at any time for any reason or for no reason. *Worley*, 1 P.3d at 620. AGC provided evidence that Hoflund was terminated because she was unable to balance her cash drawer over a period of time and because of insubordinate actions when questioned about her last submitted cash drawer statement accounting. Although Hoflund contends that AGC unlawfully terminated her from employment as an act of retaliation for reporting Midgely's sexual harassment, she did not come forward with any competent evidence sufficient to pose a genuine issue of material fact in that regard. A careful review of the pleadings filed by Hoflund reveals that contention to be purely speculative.

[¶ 29] If the party moving for summary judgment has established a prima facie case, the burden of production shifts to the opposing party who then is obliged to marshal admissible evidence, as opposed to general or conclusory allegations, establishing continuing viability of an issue of material fact. The evidence must be competent and admissible, lest the rule permitting summary judgments be entirely eviscerated by plaintiffs proceeding to trial on the basis of mere conjecture or wishful speculation. *Campbell ex. rel Campbell v. Studer, Inc.*, 970 P.2d 389, 392 (Wyo.1998) (quoting *Estate of Coleman v. Casper Concrete Company*, 939 P.2d 233, 236 (Wyo.1997)); also see *Mize v. North Big Horn Hospital District*, 931 P.2d 229, 233–34 (Wyo.1997); *Boehm v. Cody Country Chamber of Commerce*, 748 P.2d 704, 710 (Wyo. 1987); *Gennings v. First National Bank of Thermopolis*, 654 P.2d 154, 156 (Wyo.1982); and *Harris v. Grizzle*, 625 P.2d 747, 751 and 753–54 (Wyo.1981). Therefore, we conclude that the district court was correct when it ruled that Hoflund's lawful termination by AGC could not support her claims of intentional infliction of emotional distress.

## CONCLUSION

[¶ 30] We hold that the district court properly determined that summary judgment should be granted in favor of AGC. The record before us presents no material issues of fact. AGC was entitled to summary judgment as a matter of law.

[¶ 31] Affirmed.