**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**January 4, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

LEWIS HERRERA,

      Plaintiff - Appellant,

v.

LUFKIN INDUSTRIES, INC.,

      Defendant - Appellee.

No. 04-8089

---

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 03-CV-1012-D)**

---

Jeffrey C. Gosman, Gosman Law Office, Casper, Wyoming, for
Plaintiff-Appellant Lewis Herrera.

Douglas E. Hamel, Vinson & Elkins L.L.P. (Amy S. Farber, Vinson & Elkins
L.L.P., Houston Texas, Frank D. Neville and P. Craig Silva, Williams, Porter,
Day and Neville, Casper, Wyoming, with him on the briefs), Houston, Texas, for
Defendant-Appellee Lufkin Industries, Inc.

---

Before **TACHA**, Chief Circuit Judge, **EBEL**, Circuit Judge, and **CASSELL**,[*]
District Judge.

---

**EBEL**, Circuit Judge.

---

[*]Honorable Paul G. Cassell, United States District Judge for the District of
Utah, sitting by designation.

Plaintiff-Appellant Lewis Herrera appeals the district court's decision granting his employer, Defendant-Appellee Lufkin Industries, Inc. ("Lufkin") summary judgment on Herrera's Title VII claim alleging a racially hostile work environment. Because we conclude that Herrera has presented evidence in support of this claim sufficient to be entitled to have a jury resolve it, we REVERSE the district court's summary judgment decision and REMAND this Title VII claim to the district court for further proceedings.

The district court also granted Lufkin summary judgment on his state-law claim alleging Lufkin breached its employment contract with Herrera; granted Lufkin judgment as a matter of law on Herrera's state-law claim for the intentional infliction of emotional distress; and, during discovery, required Herrera to undergo a psychological examination. We AFFIRM the district court's decision on these other matters.

## I.  BACKGROUND

Lufkin is a publicly held company engaged in manufacturing and selling oilfield equipment. Lufkin's headquarters are located in Texas, but the company also maintains a number of service centers throughout the country. In addition to selling its oilfield equipment from these service centers, Lufkin also offers a variety of related machine shop and oilfield services. Lufkin has a service center in Casper, Wyoming, where Lufkin employs between six and ten people. Herrera began working at Lufkin's Casper service center in 1990 as a sales representative

2

and later became the center's field supervisor. For most of this time, Herrera's immediate supervisor was Bruce Cunningham, the Casper service center's manager. Cunningham, in turn, reported to Lufkin's general manager of service operations, Buddy Moore, who was stationed in Lufkin's Texas offices.

Herrera alleged that Moore created a racially hostile work environment for Herrera by frequently referring to him as "the Mexican" or "that fucking Mexican" and by making other derogatory remarks toward Herrera because he was Hispanic. Herrera further alleged that this harassment intensified after Moore sent management trainee Jason Dickerson to the Casper service center.

Cunningham retired as the Casper service center's manager in May 2001. According to Herrera, Moore had promised to promote him to the manager's position vacated by Cunningham. But in October 2001, Moore instead transferred the manager of another Lufkin service center, Steve Thompson, to be the new manager of the Casper service center. At that same time, Moore removed equipment from the Casper center that Herrera used to provide oilfield services. Believing, as Dickerson had told him, that his days with Lufkin were numbered, Herrera quit on October 10, 2001.

Herrera then filed a complaint with the EEOC, alleging Lufkin had discriminated against him because he is Hispanic. After receiving a right-to-sue letter, Herrera sued Lufkin, asserting nine claims. Only three of those claims are

3

relevant to this appeal: 1) Lufkin was liable under Title VII[1] for the racially hostile work environment created by its supervisors, Moore and Dickerson; 2) Lufkin breached its employment contract with Herrera when it constructively discharged him without just cause; and 3) Lufkin was liable for Moore's and Dickerson's intentional infliction of emotional distress.[2] The district court granted Lufkin summary judgment on the hostile-work-environment and breach-of-contract claims. The district court then tried Herrera's remaining claims to a jury. At the conclusion of Herrera's evidence, however, the district court granted Lufkin's motion for judgment as a matter of law, see Fed. R. Civ. P. 50, on Herrera's state-law claim alleging the intentional infliction of emotional distress. Herrera now appeals these three rulings. In addition, Herrera challenges a discovery ruling requiring Herrera to undergo a psychological examination pursuant to Fed. R. Civ. P. 35. Having jurisdiction to consider this appeal under 28 U.S.C. § 1291, we AFFIRM the district court's

---

[1] 42 U.S.C. §§ 2000e to 2000e-17.

[2] In addition to the three claims at issue in this appeal, Herrera also asserted claims alleging that Lufkin violated Title VII and 42 U.S.C. § 1981 when it failed to promote, retaliated against, and constructively discharged Herrera because he is Hispanic; and that Lufkin was negligent under Wyoming state law in its hiring and/or supervision of its supervisors, Moore and Dickerson. Before trial, the district court granted Lufkin summary judgment on the constructive discharge claim, as well as Herrera's state-law claim alleging negligent hiring/supervision. The other claims proceeded to trial, where the jury returned a verdict in Lufkin's favor on the Title VII disparate treatment and retaliation claims. Herrera does not challenge any of these decisions on appeal.

4

decisions addressing discovery and the state-law claims, but we REVERSE the district court's decision granting Lufkin summary judgment on the Title VII hostile-work-environment claim, and REMAND that claim to the district court for further proceedings consistent with this court's decision.

## II. ISSUES

### A. Whether the district court erred in granting Lufkin summary judgment on Herrera's claim that his work environment was racially hostile.

#### 1. Standard of review

This court reviews the district court's summary judgment decision de novo, viewing the evidence in the light most favorable to the non-moving party; in this case, in Herrera's favor. See Pepsi-Cola Bottling Co. of Pittsburgh, Inc. v. Pepsico, Inc., 431 F.3d 1241, 1255 (10th Cir. 2005). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

#### 2. Analysis

"Title VII forbids employment discrimination on the basis of race or national origin." Chavez v. New Mexico, 397 F.3d 826, 831 (10th Cir. 2005) (citing 42 U.S.C. § 2000e-2(a)(1)). This includes an employee's claims of a hostile work environment based on race or national origin discrimination. See id.

5

at 831-32. To survive summary judgment on a claim alleging a racially hostile work environment, Herrera "must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and that the victim "was targeted for harassment because of [his] . . . race[] or national origin." Sandoval v. City of Boulder, 388 F.3d 1312, 1326-27 (10th Cir. 2004) (quotation omitted); see also Chavez, 397 F.3d at 832.

In this case, Herrera has asserted sufficient evidence from which a jury could find that his work environment was racially hostile.  In particular, he has submitted sufficient evidence indicating that his workplace was pervasively discriminatory.

A plaintiff does not make a showing of a pervasively hostile work environment "by demonstrating a few isolated incidents of racial enmity or sporadic racial slurs.  Instead, there must be a steady barrage of opprobrious racial comments." Chavez, 397 F.3d at 832 (quotations, citation omitted). Nevertheless, "the severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact."[3]

_____

[3]"There is no 'mathematically precise test' for determining whether the conduct is sufficiently . . . pervasive." Turnbull v. Topeka State Hosp., 255 F.3d 1238, 1243 (10th Cir. 2001) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993)).  "[W]hile courts have tended to count events over time to determine

(continued...)

6

McCowan v. All-Star Maintenance, Inc., 273 F.3d 917, 923 (10th Cir. 2001) (quotations omitted). In making this determination, we consider the work atmosphere "both objectively and subjectively, . . . look[ing] at all the circumstances from the perspective of a reasonable person in the plaintiff's position." Id. (quotations, citation omitted).

Herrera presented evidence of several discrete incidents of racial harassment occurring during the four years that Buddy Moore oversaw Lufkin's Casper service center while Herrera worked there. Herrera testified that when he first met Moore, in 1997, Moore refused to shake Herrera's hand. And in 1999, Moore sent Cunningham some candy with a note attached indicating it was "Mexican peanut brittle." Moore directed that Cunningham give this candy to Herrera. Cunningham did so, including Moore's note. Herrera was offended. Herrera sought advice from an attorney about these incidents and complained to Lufkin's human resources attorney, to no avail.

Also in 1999, Moore told Cunningham to have Herrera talk to a certain customer because that customer was Mexican. Cunningham relayed this message to Herrera. On another occasion in 1999, Moore himself told Herrera to go see another customer because that customer "was from San Antonio . . . so he likes

---

[3](...continued)
pervasiveness, the word 'pervasive' is not a counting measure. The trier of fact utilizes a broader contextual analysis." Nieto v. Kapoor, 268 F.3d 1208, 1219 n.8 (10th Cir. 2001) (quotation omitted).

Mexicans."  In addition, Moore once said directly to Herrera, "Spanish lover, come here."

On yet another occasion, Moore told Cunningham to tell Herrera not to "Mexicanize" Herrera's new company truck.  Carolyn Coleman, the Casper service center's secretary, translated "Mexicanize" to mean "lots of chrome, you know, dice hanging off the mirror."  Moore also wanted Herrera to remove a cactus from atop the truck's antenna.  Moore gave this directive several times in late 2000 and again in early 2001.  Cunningham relayed these comments to Herrera.

In addition to these discrete incidents, however, Herrera also asserted evidence of other ongoing harassment occurring during this entire four-year time period.  Moore would refer to Herrera as "the Mexican" or "the fucking Mexican" whenever Moore would speak to Herrera's supervisor, Cunningham, and sometimes when Moore spoke to the Casper service center's secretary, Carolyn Coleman, and the warehouse manager, Bill Bryant.  This did not happen just once or twice.  Rather, there is evidence that Moore made such comments every two to three days.[4]  Although Cunningham did not tell Herrera about these comments every time Moore made such references to Herrera, both Cunningham and

---

[4]Cunningham testified that "about every second or third day Mr. Moore would call and he would make reference to that fucking Mexican."  There were, however, several times during this four-year span of time when Cunningham would be out of the office for extended periods of time due to health problems.

8

Coleman did occasionally tell Herrera about them.[5]  Further, in light of Moore's

racially charged comments, Cunningham specifically warned Herrera to be wary

of Moore because he was a bigot.[6]

Additionally, it was Moore who transferred Jason Dickerson to the Casper

service center in September 2000.  Herrera believed Moore had sent Dickerson to

get rid of him.  Herrera's suspicion was borne out when he asked Dickerson, in

the midst of a heated argument, why Dickerson had been trying to get rid of

---

[5]In granting Lufkin summary judgment on this hostile-work-environment
claim, the district court indicated that "[t]he insults that were identified were
never, according to the evidence before the Court, divulged to the plaintiff.  In
fact, his friends, knowing of these insults, largely concealed them from him.  It
cannot be a hostile work environment if he doesn't know about them."  But the
evidence in the record indicates to the contrary that Cunningham, Coleman and
Bryant did tell Herrera about Moore's racist remarks.

The dissent speculates that, instead of stating that "[t]he insults that were
identified were never . . . divulged to the plaintiff," the district court meant to say
that the insults were never "directed" toward Herrera.  Dissent at 5 n. 11.
Although we cannot speculate as to what the district court really meant to say,
apart from the language the court in fact used, the word the district court actually
used, "divulge," makes more sense in light of the sentences immediately
following that statement–"In fact, his friends, knowing of these insults, largely
concealed them from him.  It cannot be a hostile work environment if he doesn't
know about them."

[6]It cannot be, as the dissent suggests, see Dissent at 4-5, that the fact that
the harasser makes racially derogatory references about the victim to others
shields the harasser from any Title VII liability.  This is not a case where Herrera
was completely unaware of Moore's racially derogatory references about Herrera.
Rather, viewing the evidence in the light most favorable to Herrera, he clearly
was aware of these references and they were upsetting to him.  And these racially
derogatory references served to buttress the racially charged treatment Moore
specifically directed at Herrera.

9

Herrera since Dickerson arrived at the Casper service center and Dickerson

responded "Why do you think I was sent here?"[7]

---

[7]Although the dissent does not specifically address the evidence, viewed in the light most favorable to Herrera, of Dickerson's harassment of Herrera undertaken at Moore's behest, that evidence is sufficient to link Dickerson's general harassment of Herrera to Moore's demonstrated racial animus.  And in any event, "[f]acially neutral abusive conduct can support a finding of [racial] animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly [racially]-discriminatory conduct." Chavez, 397 F.3d at 833 (quotation omitted) (addressing sexual harassment claim).

> This is because what is important in a hostile environment claim is the environment, and [racially]-neutral harassment makes up an important part of the relevant work environment.  Conduct that appears [racially]-neutral in isolation may in fact be [race]-based, but may appear so only when viewed in the context of other [race]-based behavior.  Thus, when a plaintiff introduces evidence of both [race]-based and [race]-neutral harassment, and when a jury, viewing the evidence in context, reasonably could view all of the allegedly harassing conduct . . . as the product of [racial] hostility, then it is for the fact finder to decide whether such an inference should be drawn.

Id. (quotations, citation omitted); see also McCowan, 273 F.3d at 925-26; O'Shea v. Yellow Tech. Servs., Inc., 185 F.3d 1093, 1097, 1102 (10th Cir. 1999).  Further,

> the totality of the circumstances analysis in cases like the one before us obviates what would otherwise be the court's call in deciding how many racist comments constitute harassment or whether general profanity and vulgarity mixed with specific racial, ethnic, or sexual epithets equate to the sum of pervasiveness required . . . .  Rather, by framing the evidence on summary judgment within the context of this particular workplace, we eliminate the suggestion that a certain number of comments is or is not actionable . . . and leave the resolution to the trier of fact.

McCowan, 273 F.3d at 926.

10

There was also evidence that Dickerson treated Herrera and his son, the Casper service center's only Hispanic employees, worse than he treated other employees.[8] Dickerson spoke harshly and condescendingly to them. He enforced company policies more strictly against Herrera and his son than against any other Casper service center employee.[9] He constantly hounded Herrera to complete his paperwork when there were other employees further behind with their paperwork than Herrera. In addition, although there is no evidence that Dickerson specifically directed any racial epithets toward Herrera, there was evidence

[8]Cougar Boyce testified that he "never saw [Dickerson] talk to a Caucasian like he did with Mr. Herrera," and Bill Bryant testified that Dickerson "would ask stuff of [Herrera] that none of the rest of us had to do."

[9]For example, pursuant to new Lufkin guidelines, Dickerson directed Herrera not to let his son, Lewis Herrera, Jr., drive Herrera's Lufkin truck, because Herrera was to use that truck only for work-related purposes. But Herrera, Jr., was a Lufkin employee who would use Herrera's company truck to take the Lufkin field crew to and from job sites, a work-related activity. And Lufkin's policy did permit another Lufkin employee to drive a company vehicle for work purposes. In fact, Moore acknowledged that Herrera, Jr.'s using the Lufkin truck for this purpose would be appropriate under the company's policy. Yet Dickerson refused to permit it. Moreover, Dickerson himself apparently used his company truck for personal reasons, because Coleman reported seeing beer cans and shotgun shells in it. And Jeff Clark, the shop foreman, admitted that he had used Lufkin's bucket truck for personal business as well.

Dickerson also permitted Herrera and his field crew to recover expenses for only two, instead of three, meals for each day they were working out of town, and Dickerson required Herrera and his crew to submit a receipt for every expense incurred. Yet Lufkin policy only required receipts for any expenses over fifteen dollars. And Lufkin reimbursed other Casper service center employees for three meals a day while they were travelling for business purposes. Further, there was evidence Dickerson audited Herrera's receipts, and those of his field crew, but did not audit those of any other service center employees.

11

Dickerson used such terms when referring to Hispanics in general conversation.[10]

The evidence, submitted by Herrera and Lufkin, addressing whether Moore's and Dickerson's racial harassment of Herrera was pervasive presents a close question. And it may be that a jury, after considering all of the evidence and cross-examination at trial, would find that Moore's and Dickerson's treatment of Herrera was not sufficiently pervasive to create a racially hostile work environment. But, viewing this evidence in the light most favorable to Herrera, he has established a genuinely disputed issue of fact as to the pervasiveness of the racially-charged hostility in this work environment sufficient to be entitled to have a jury decide the issue.[11]

---

[10]Herrera's son testified that Dickerson used the terms "wetback" and "spics" when discussing Mexicans, and Cougar Boyce testified that Dickerson referred to Mexicans as "wetbacks" when discussing illegal immigration.

[11]The dissent asserts that the fact that Herrera worked in a "rough-and-tumble" environment negates Herrera's evidence that the atmosphere at his work was racially hostile. See Dissent at 2-3, 5-6. The evidence did suggest that profanity and ethnic jokes were the norm at Lufkin's Casper service center. If that was all that Herrera complained about, we might agree with the dissent. But Herrera has presented evidence of racially derogatory treatment, well beyond being sworn at and joked with, that was specifically directed at Herrera because of his national origin. Cf. Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1539, 1542-46, 1547-48 (10th Cir. 1995) (noting, in sexual harassment case, that, although evidence "that a woman was subjected to a steady stream of vulgar and offensive epithets because of her gender would be sufficient to establish a claim under Title VII," evidence of a single incident of gender-based conduct plus evidence of supervisor's frequent use of gender-neutral profanity and vulgarities was insufficient for sexual harassment claim to survive summary judgment) (emphasis added).

12

**B.** **Whether the district court erred in granting Lufkin summary judgment on Herrera's state-law claim alleging Lufkin breached its employment contract with him.[12]**

**1.** **Standard of review**

In cases involving state-law claims, a federal court applies the substantive law of the state, but applies federal procedural law. See Ahrens v. Ford Motor Co., 340 F.3d 1142, 1145 (10th Cir. 2003). As noted earlier, this court reviews de novo the district court's summary judgment decision, viewing the evidence in the light most favorable to Herrera. See Pepsico, Inc., 431 F.3d at 1255; Ahrens, 340 F.3d at 1145.

**2.** **Analysis**

Although under Wyoming law a contract exists in every employment situation (see Ormsby v. Dana Kepner Co. of Wyo., Inc., 997 P.2d 465, 471 (Wyo. 2000); see also Sierra Trading Post, Inc. v. Hinson (In re Sierra Trading Post, Inc.), 996 P.2d 1144, 1147 (Wyo. 2000)) that contractual employment relationship

> is presumed to be at will. In an at-will employment relationship, either the employer or the employee may terminate the relationship at any time, for any reason or for no reason at all. The presumption that the employment relationship is at-will may be rebutted by a showing that the parties entered into an express or implied-in-fact agreement that the employee would be discharged only with just cause.

_____

[12]Despite Lufkin's argument to the contrary, this court had jurisdiction to consider this argument on appeal. Herrera clearly included the district court's decision granting Lufkin summary judgment on this breach-of-contract claim in his notice of appeal.

13

Finch v. Farmers Co-op Oil Co., 109 P.3d 537, 541 (Wyo. 2005) (citations, quotations omitted).  Stated another way, an employment relationship will not be at-will if the employer promises the employee continued employment.  See Boone v. Frontier Refining, Inc., 987 P.2d 681, 685 (Wyo. 1999).

Herrera argues that Lufkin's employee manual created a contract promising him continued employment.  We disagree.  It is true that, under Wyoming law, "[a]n employment handbook . . . may supply terms for an implied-in-fact employment contract which requires termination for cause . . . ."  Finch, 109 P.3d at 542 (quotation, alteration omitted).  Nevertheless, before the district court, Herrera relied on only one provision of Lufkin's employee handbook:

> Job Security: **LUFKIN** makes every effort to provide continuous employment.  The ability to do so depends largely upon general business conditions, but continuous employment also depends to a great extent upon every **LUFKIN** employee.  The company can remain competitive only by producing more and better products and by providing faster service at the lowest possible cost.  When the price is right for quality products like ours we get more orders which means more jobs and greater security for everyone.  An individual employee can increase his job security by increasing his knowledge and skills.  The more knowledge and skill you acquire, the more productive you are likely to be, and naturally the more productive, the better your chance for stable employment.

This provision, however, does not promise Herrera continued employment.

For the first time on appeal, Herrera asserts there are other provisions in the Lufkin employee manual that promise continued employment.  Because he did not rely upon these provisions in the district court, however, he cannot do so now on

14

appeal. See Shell Rocky Mountain Prod. v. Ultra Res., Inc., 415 F.3d 1158, 1164 (10th Cir. 2005) (noting as general rule, appellate court will not review matters raised for the first time on appeal). For these reasons, we affirm the district court's decision granting Lufkin summary judgment on this Wyoming state-law breach-of-contract claim.[13]

> **C. Whether the district court erred in granting Lufkin judgment as a matter of law, under Fed. R. Civ. P. 50(a), on Herrera's state-law claim for the intentional infliction of emotional distress.**

>> **1. Standard of review**

As previously mentioned, in cases involving state-law claims, a federal court applies the substantive law of the state, but applies federal procedural law. See Ahrens, 340 F.3d at 1145. After Herrera had presented his evidence at trial, the district court granted Lufkin judgment as a matter of law, pursuant to Fed. R. Civ. P. 50(a), on Herrera's Wyoming state-law claim for the intentional infliction of emotional distress. Rule 50(a)(1) provides that

> [i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of

---

[13]Herrera also asserts that verbal representations his supervisor, Cunningham, made at the time Herrera was hired and when he went from being an hourly to a salaried employee, further support his allegation that the employee manual promised him continued employment. Because we conclude that the employee manual does not promise Herrera continued employment and Herrera did not adequately claim or establish a free-standing oral contract apart from the employee manual, we need not separately address Cunningham's verbal representations.

15

law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

A judgment as a matter of law is warranted "only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position." Riske v. King Soopers, 366 F.3d 1085, 1088-89 (10th Cir. 2004) (quotation omitted).

> The question is not whether there is literally no evidence supporting the nonmoving party but whether there is evidence upon which a jury could properly find for that party. For a jury to properly find for a party, the party must present more than a scintilla of evidence supporting its claim.

Century 21 Real Estate Corp. v. Meraj Int'l Inv. Corp., 315 F.3d 1271, 1278 (10th 2003) (quotation, alterations omitted).

This court reviews the district court's Rule 50 decision de novo, see Riske, 366 F.3d at 1088, "reviewing all of the evidence in the record," Stewart v. Adolph Coors Co., 217 F.3d 1285, 1288 (10th Cir. 2000), in the light most favorable to the non-moving party; in this case, in Herrera's favor, see Riske, 366 F.3d at 1087.

### 2. Analysis

Wyoming recognizes a tort cause of action for the intentional infliction of emotional distress: "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for

16

such emotional distress, and if bodily harm to the other results from it, for such

bodily harm." Cook v. Shoshone First Bank, 126 P.3d 886, 891 (Wyo. 2006)

(quotation omitted). To recover on such a claim in this case, therefore, Herrera

must establish that Lufkin 1) "acted in an extreme and outrageous manner," and

2) "intentionally or recklessly caused [Herrera] severe emotional harm." Worley

v. Wyo. Bottling Co., 1 P.3d 615, 628 (Wyo. 2000). Because Herrera was unable

to assert sufficient evidence at trial from which a jury could have found that

Lufkin, on its own or through its supervisors, Moore and Dickerson, acted in an

extreme and outrageous manner, we need not address whether Herrera presented

the jury with sufficient evidence on the second element, that Lufkin intentionally

caused him severe emotional distress.[14]

When the Wyoming Supreme Court first adopted a cause of action for the

intentional infliction of emotional distress, it recognized that

> [p]arties opposing the cause of action for intentional infliction of
> emotional distress typically contend that its adoption will flood the
> courts with fraudulent claims and create potentially unlimited liability
> for every type of mental disturbance. While these problems are not to
> be dismissed lightly, they can certainly be solved without rejecting the
> action entirely.

Leithead v. Am. Colloid Co., 721 P.2d 1059, 1065 (Wyo. 1986). The Wyoming

Supreme Court was satisfied that, by adopting the definition of this tort from

---

[14]In light of this conclusion, we also do not need to address Lufkin's alternative argument that, under Wyoming law, an employer cannot be liable for its employee's conduct resulting in the intentional infliction of emotional distress.

17

Section 46 of the Restatement (Second) of Torts, this cause of action's application could be sufficiently limited. See id. at 1065-66 (discussing and adopting Section 46; noting that "[t]he limits imposed in § 46 of the Restatement, together with the jury's common sense, should prove to be adequate protection against fraudulent or frivolous claims"); see also Hoflund v. Airport Golf Club, 105 P.3d 1079, 1089 (Wyo. 2005) (noting Section 46 "attempts to clarify the parameters of outrageous behavior"). In particular, the Wyoming Supreme Court recognized the limitations on that cause of action provided by comment d to Section 46, which limits actionable "outrageous conduct" to "conduct which goes beyond all possible bounds of decency, is regarded as atrocious, and is utterly intolerable in a civilized community."[15] Leithead, 721 P.2d at 1066.

---

[15]In full, that comment provides that

*d. Extreme and outrageous conduct.* The cases thus far have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim "Outrageous!"

The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough

(continued...)

18

In a further effort to limit application of this cause of action for the intentional infliction of emotional distress, the Wyoming Supreme Court also adopted § 46's comment h, which indicates that "'[i]t is for the court to determine in the first instance whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so.'" Leithead, 721 P.2d at 1066 (quoting Restatement (Second) of Torts § 46 cmt. h). A claim, then, should only go to the jury if reasonable people could differ as to whether the conduct at issue was extreme and outrageous. See id. (citing Restatement (Second) of Torts § 46 cmt. h).

In subsequent cases considering claims for the intentional infliction of emotional distress, the Wyoming Supreme Court has specifically recognized "that

---

[15](...continued)

edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam. It is only where there is a special relation between the parties, as stated in § 48 [addressing special liability of a public utility for the insults of its servants], that there may be recovery for insults not amounting to extreme outrage.

Restatement (Second) of Torts § 46 cmt. d (citation omitted). The Wyoming Supreme Court has relied on comment d in its entirety to define the outrageous conduct necessary to state a claim for the intentional infliction of emotional distress. See Hoflund, 105 P.3d at 1089-90; Loya v. Wyo. Partners of Jackson Hole, Inc., 35 P.3d 1246, 1252-53 (Wyo. 2001); Worley, 1 P.3d at 627-28.

19

certain conduct in employment situations may be outrageous enough to provide [an] employee with a claim for intentional infliction of emotional distress." Hoflund, 105 P.3d at 1089 (quotation omitted) (addressing such a claim in the context of termination from employment); see also Kanzler v. Renner, 937 P.2d 1337, 1341-42 (Wyo. 1997) (recognizing "inappropriate sexual conduct in the workplace can, upon sufficient evidence, give rise to a claim of intentional infliction of emotional distress"). In fact, "a number of courts have recognized the employer-employee relationship as a significant factor to determining outrageousness. It is only natural that [an employer's] position of power over a[n] employee] may enhance [the employer's] ability to do harm." Loya, 35 P.3d at 1253 (citations, quotations omitted). Nevertheless,

> [t]hat does not mean, . . . that [the Wyoming Supreme] Court wishes to lower the threshold for determining liability whenever the parties are employer and employee. The conduct must still reach the same degree of outrageousness if an employee is to prove that his or her employer has committed this tort; the employment relationship is merely one factor among many to use in analyzing individual cases.

Id. (quotation omitted).

> Under Wyoming law generally
>
> "liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind."

Worley, 1 P.3d at 628 (quoting Restatement (Second) of Torts § 46 cmt. d). This

20

is no less true in the employment context. "Indeed, the workplace is not always a tranquil world where civility reigns. Personality conflicts and angst over disciplinary actions can be expected." Id. at 629 (quotation, alteration omitted). Thus, not all unkind or inappropriate conduct in the workplace is outrageous.

In this case, even viewing the evidence in the light most favorable to Herrera, see Riske, 366 F.3d at 1087, he did not present sufficient evidence at trial from which jurors could have found that Lufkin and/or its supervisors acted in a sufficiently extreme and outrageous manner. Herrera's evidence of specific incidents of racial harassment – Moore's refusing to shake Herrera's hand, directing Herrera to call on particular customers because the customer either was Mexican or liked Mexicans, sending Herrera "Mexican peanut brittle," and directing that Herrera not "Mexicanize" his Lufkin truck – amounts to no more than the "'insults, indignities, . . . annoyances, petty oppressions [and] trivialities'" that are insufficient to support a claim for the intentional infliction of emotional distress. Worley, 1 P.3d at 628 (quoting Restatement (Second) of Torts § 46 cmt. d). So, too, are Moore's frequent references to Herrera as "the Mexican" or the "fucking Mexican." Finally, Herrera's evidence indicating that Dickerson, at Moore's direction, harassed Herrera generally in an attempt to get rid of him, under the circumstances of this case, only amounts to a series of workplace disputes that also cannot support a claim for the intentional infliction of emotional distress.

21

At first glance, our conclusion here – that Herrera's evidence was insufficient to establish the outrageous conduct necessary to support a claim for the intentional infliction of emotional distress under Wyoming law – seems to be in some tension with our earlier conclusion in this opinion that Herrera was able to assert a triable issue as to whether Lufkin created a racially hostile work environment actionable under Title VII. But a claim for the intentional infliction of emotional distress makes actionable only the most egregious conduct. The Wyoming Supreme Court adopted this tort claim with that limitation explicitly in mind. See Leithead, 721 P.2d at 1065-66. And the Wyoming Supreme Court has never equated the existence of harassment actionable under Title VII, alone, with outrageous conduct sufficient to support a claim for the intentional infliction of emotional distress. Cf. Kanzler, 937 P.2d at 1342 n.3 (addressing claim for the infliction of emotional distress based on allegations co-worker sexually harassed plaintiff, but also noting that the Wyoming Court was using the term "sexual harassment" in a more general sense than the Title VII definition); David C. Yamada, The Phenomenon of "Workplace Bullying" and the Need for Status-Blind Hostile Work Environment Protection, 88 Geo. L.J. 475, 503 (2000) (noting that "the degree of severity of conduct and harm to the plaintiff required under hostile work environment and discrimination analyses is notably lower than that required under [intentional infliction of emotional distress]. In effect, the courts have said that conduct that is actionable under an employment

22

discrimination theory often does not rise to the level of [intentional infliction of emotional distress].").

In addition, Wyoming specifically makes the court the gatekeeper for claims alleging the intentional infliction of emotional distress, charging the court with preventing claims based upon less than outrageous conduct from even getting to a jury. See Leithead, 721 P.2d at 1066 (adopting Restatement (Second) of Torts § 46 cmt. h). With that in mind, we cannot conclude that the district court in this case erred in granting Lufkin judgment as a matter of law on Herrera's claim for the intentional infliction of emotional distress. We agree with the district court that, to have done otherwise would be to shirk its gatekeeping responsibilities imposed by Wyoming law and, instead, to conclude that "every time there's a case for race discrimination it follows there's a claim for intentional infliction" of emotional distress. Wyoming law does not require that result. For these reasons, therefore, the district court did not err in granting Lufkin judgment as a matter of law.

**D.** **Whether the district court abused its discretion in requiring Herrera to undergo a mental examination under Fed. R. Civ. P. 35.**

**1.** **Standard of review**

This court reviews discovery decisions pertaining to Rule 35 examinations for an abuse of discretion. See Green v. Branson, 108 F.3d 1296, 1304 (10th Cir. 1997). "Under this standard, we will not disturb a trial court's decision absent a

23

definite and firm conviction that the [district] court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." Norton v. City of Marietta, 432 F.3d 1145, 1156 (10th Cir. 2005) (per curiam) (quotation omitted).

### 2.   Analysis

Rule 35(a) of the Federal Rules of Civil Procedure provides that

> [w]hen the mental or physical condition . . . of a party . . . is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a suitably licensed or certified examiner . . . . The order may be made only on motion for good cause shown and upon notice to the person to be examined and to all parties and shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made.

Unlike other discovery mechanisms, such as interrogatories or depositions, which a party can invoke on his own, Rule 35 requires the party seeking to conduct a medical examination first to obtain the district court's permission. See Schlagenhauf v. Holder, 379 U.S. 104, 117-18 (1964). To obtain a court's order for an independent medical examination ("IME"), the party seeking the exam must show that "the mental or physical condition" of the party who is to be examined "is in controversy," and that there is "good cause" for the examination. See id. at 118-19. Notwithstanding Rule 35's requirements, however, "physical and mental examinations are usually arranged by stipulation of the attorneys, with the rule standing as a compulsory sanction that helps to produce stipulations."

24

8A Charles Alan Wright et al., Federal Practice and Procedure § 2234 (2d ed. 1994).  And "[p]laintiffs who voluntarily submit to an examination by a physician selected by defendant waive their right to insist upon a [Rule 35] motion for an order of examination."  Id.

In this case, the parties agreed to a stipulated discovery schedule which provided that Lufkin could obtain an IME of Herrera, pursuant to Rule 35(a), within a specific twenty-day time period.[16]  When Lufkin requested dates on which Herrera was available for the IME, however, Herrera failed to respond. Lufkin inquired a second time, after January 20, 2004, but this time Herrera responded that the time to conduct the IME had expired.  On February 9, 2004, Lufkin filed a Rule 37 motion seeking to compel discovery of Herrera's mental

---

[16]The district court's "Order on Stipulated Discovery Schedule" specifically provided that

> [t]he Defendant may require the Plaintiff to submit to a Rule 35 examination any time before five (5) weeks prior to commencement of trial.
>
> > a.  The Defendant shall designate said expert on or before one week after such examination.
> >
> > b.  If the Defendant designates an expert earlier, Defendant must schedule and complete the examination no later than twenty (20) days following the Plaintiff['s] Deposition, unless otherwise agreed by counsel.

Lufkin designated its expert on November 17, 2003, and completed Herrera's deposition on December 31, 2003.  Lufkin, then, had twenty days from that date, by approximately January 20, 2004, to conduct the IME.

25

condition.[17]  The magistrate judge granted that motion, ordering Herrera to submit to an IME.  The district court upheld the magistrate judge's decision.  In doing so, the district court did not abuse its discretion.

On appeal, as before the district court, Herrera argues that, despite the parties' stipulated discovery schedule, Lufkin still had to file a successful Rule 35 motion before the district court could compel Herrera to undergo an IME.  Even assuming for purposes of this appeal that this is true, however, Lufkin sufficiently complied with Rule 35's requirements in this case.  In its reply addressing the motion to compel the IME, Lufkin did specifically request an order under Rule 35 permitting it to conduct an examination.  And both the magistrate judge's ruling granting the Rule 37 motion to compel discovery, as well as the district court's decision upholding that ruling, addressed Rule 35's requirements for ordering a mental examination, determining that Herrera's physical and mental condition was "in controversy" and that Lufkin had shown "good cause" for the exam.  See Schlagenhauf, 379 U.S. at 118-19.  Moreover, Herrera himself "stipulate[d] that his mental condition is in controversy."[18]  Further, both the magistrate judge and

_____

[17]Rule 37 of the Federal Rules of Civil Procedure, in part, provides a mechanism that allows "[a] party, upon reasonable notice to other parties and all persons affected thereby, [to] apply for an order compelling disclosure or discovery."  Fed. R. Civ. P. 37(a).

[18]Additionally, the Supreme Court has noted that a party's own pleading may put his physical or mental condition "in controversy."  See Schlagenhauf, 379 U.S. at 119.  Herrera's allegations in this case, involving, inter alia, his

(continued...)

26

the district court addressed the scope of the IME.

For these reasons, we cannot say that the district court, in requiring Herrera to undergo a mental examination, abused its discretion; that is, the district court did not make "a clear error of judgment or exceeded the bounds of permissible choice in the circumstances," Norton, 432 F.3d at 1156 (quotation omitted). Our conclusion is bolstered by the Supreme Court's indication that Rule 35 is "to be accorded a broad and liberal treatment, to effectuate [the civil procedure rules'] purpose that civil trials in the federal courts no longer need be carried on in the dark." Schlagenhauf, 379 U.S. at 114-15 (citation, quotation omitted).

## III. CONCLUSION

For these reasons, we AFFIRM the district court's discovery ruling requiring Herrera to undergo a psychological examination and the district court's decisions addressing the state-law claims. But we REVERSE the district court's decision granting Lufkin summary judgment on Herrera's Title VII hostile-work-environment claim, and REMAND that claim to the district court for further proceedings consistent with this opinion.

---

[18](...continued)
assertion that he suffered severe emotional distress, certainly put his mental condition "in controversy."

27

04-8089, *Herrera v. Lufkin Industries, Inc.*

**CASSELL**, District Judge (sitting by designation), dissenting in part.


Before trying this case, the district judge pruned it down by granting summary judgment for Lufkin Industries on Herrera's three weakest claims — an intentional infliction of emotional distress claim, a breach of contract claim, and a racially hostile work environment claim. The matter was then tried to a jury for eleven days, eight of which were devoted to the plaintiff's case. The jury found against Herrera and for Lufkin on all claims presented to it. The majority now sustains the jury verdict and agrees that the district court properly dismissed the emotional distress claims and the breach of contract claim. It nonetheless remands this case for what may end up being another eleven-day trial on one of Herrera's marginal claims – the hostile work environment claim.

I dissent from this unnecessary remand. I agree with the district court that the isolated instances of harassment Herrera recites are not sufficient to create a jury question on this claim. I would therefore affirm the district court in all respects.

### The District Court Properly Granted Summary Judgment on Herrera's Hostile Work Environment Claim.

The majority reverses the district court's decision to grant summary judgment on Herrera's hostile work environment claim, stipulating that this issue

"presents a close question."[1]  And the majority recognizes Herrera must present evidence of more than "'a few isolated incidents of racial enmity' or 'sporadic racial slurs.'"[2]  Instead, "'there must be a steady barrage of opprobrious racial comments.'"[3]

While I agree with the majority that this issue is a close one, I concur with the district court's decision to grant summary judgment.  Before describing the instances of alleged harassment Herrera relies upon, it is important to review his working environment.  Herrera admits that Lufkin was a rough-and-tumble oil field equipment business that was not the typical office setting.  He testified, in response to a question regarding a coworker who said to him "fuck you,"

> Q.    [I]n the oil patch, people use [vulgar] language, correct?
> A.    Okay.  Yes.
> Q.    In the shop, people use that kind of language — Lufkin shop, yes?
> A.    Yes.  I — some of them do.[4]

He also testified:

> Q.    Have you ever told "Mexican" jokes or anything such as that?
> A.    That I may have done.  I told a lot of jokes, but I don't remember saying any Mexican jokes or black jokes, for

---

[1]Majority Op. at 12.

[2]*Id.* at 6 (quoting *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005)).

[3]*Id.* (quoting *Chavez*, 397 F.3d at 832).

[4]Appellant App. at 167.

2

that matter.

. . . .

Q. Okay. You would not be extremely surprised that someone said, yes. I heard Lewis, Senior tell a joke with the reference to a Mexican in it, that would not be so out of the ordinary that you would be shocked?

A. I wouldn't be shocked, no. I told a lot of jokes in my day. I don't remember them.

Q. Sure. Okay. In fact, that happens in the work place, off color jokes and so forth are told?

A. Not in relation to anybody else. I don't do that. Blacks or whites or religious, I don't do that.

Q. Okay. But there are others that do that in the work place, don't they?

A. Yeah. *The oil field is very co[a]rse.*

Q. Yeah. The oil patch has people —

A. *It's own language.*[5]

With this general atmosphere in mind, the instances of alleged race-neutral harassment Herrera invokes are insufficient to justify a remand for a trial on his hostile work environment claim. Herrera worked under Moore for approximately four years. In his deposition, Herrera identified five specific instances of alleged harassment during those four years that unquestionably were linked to his race — on average, about one instance every nine or ten months. Moore once sent him a package of peanut brittle; attached to it was a note that read "Mexican peanut brittle."[6] Herrera was twice asked to call on certain customers because they

---

[5] *Id.* at 788 (emphasis added).

[6] *Id.* at 785.

3

"liked Mexicans" or were themselves Hispanic.[7]  Moore, who worked out-of-state, would call the Wyoming office and ask for Herrera by calling him "that Mexican" or "that fucking Mexican."[8]  Notably, Herrera does not allege that Moore said those things directly to him.  Finally, Moore once had other employees tell Herrera not to "Mexicanize" his work truck and to remove a cactus figurine from the truck's antenna.

The majority seems to agree that these "several discrete incidents" are not sufficient to satisfy the requirements of our precedent for a hostile work environment claim.  It finds support for Herrera's claims, however, in "evidence of other ongoing harassment occurring during this entire four-year time period."[9]  On close examination, however, the evidence of any ongoing harassment is scanty.  The majority relies upon Moore's references to Herrera as "that Mexican" or sometimes, "that fucking Mexican" to other people.  While these derogatory comments may have been ongoing (at least viewing the evidence favorably to Herrera), even the majority concedes that most of the remarks were never heard by Herrera.  Instead, the majority agrees that Herrera's co-workers passed along

---

[7]*Id.*

[8]*Id.*

[9]Majority Op. at 8.

4

these remarks to him only "occasionally."[10]  And the record is undisputed that when the remarks were passed along, they were passed along by those trying to help Herrera, not harm him.  For example, Cunningham warned Herrera to be wary of Moore because he was a bigot.  It is hard to discern "pervasive" harassment when racial remarks were "occasionally" passed along by persons friendly to Herrera.  Thus, I do not understand the majority to dispute the district court's conclusion that Herrera's "friends, knowing of these insults, *largely* concealed them from him."[11]  For example, the majority ventures only so far as to say that Herrera was not "completely unaware" of derogatory remarks made by Moore.[12]

To find a basis for reversal, the majority couples these remarks with other race-neutral incidents.  Of course, our precedent requires us to view an employee's work environment as a whole.  But given the coarse environment that prevailed at Lufkin, these incidents do not combine to create a viable hostile work environment claim.  Herrera alleges Moore refused to shake his hand; coworkers

---

[10]*Id.* at 9.

[11]Appellant App. at 954 (emphasis added).  The majority does disagree with the district court's statement that "[t]he insults that were identified were never, according to the evidence before the Court, *divulged* to the plaintiff." *Id.* (emphasis added).  I think the district court intended to use the word "directed" rather than "divulged," as the sentence quoted in text above makes clear.  In any event, the majority agrees that the insults were never directed at Herrera.

[12]Majority Op. at 9 n.6.

5

told him to "watch your ass" because Moore was a bigot; he was treated like a kid and yelled at, as was his son, by another Lufkin employee; coworkers swore at him and Lufkin did nothing about it; he was audited and forced to produce receipts before he could be reimbursed for road trip expenses; he was "hindered" from doing his job and made to look incompetent; he had to drive his boss to the airport; and some coworkers started prying into his personal life and accused him of conducting side businesses.[13]

Given the atmosphere Mr. Herrera testified existed at Lufkin, these incidents (while deplorable, if they happened) cannot be viewed as indicia of pervasive racial discrimination. Vulgarity and other socially-unacceptable behavior that might lead to termination in a typical office setting were commonplace in the oilfields. Since raucous race-neutral behavior permeated Herrera's working environment, the conduct he describes above — even when yoked to the five unquestionably race-based incidents — is not evidence Herrera's work environment was permeated with *discriminatory* ridicule.

This result is required by our previous cases. For instance, in *Bolden v. PRC Inc.*,[14] we affirmed a district court's grant of summary judgment where the plaintiff cited two incidents of overtly racial discrimination and twenty instances

---

[13]Appellant App. at 785–86.

[14]43 F.3d 545 (10th Cir. 1994).

6

of race-neutral conduct during the last eighteen months of his employment.[15]  And in *Hicks v. Gates Rubber Co.*,[16] we found that a district court's bench trial ruling of no hostile environment was not clearly erroneous despite evidence of approximately nine incidents of harassment over a period of eight months.[17]

These cases reveal the continuing import of our prior holding that "Title VII is not a code of workplace conduct, nor was it 'designed to bring about a magical transformation in the social mores of American workers.'"[18] As this court noted in *Gross v. Burggraf Construction Co.*, "[s]peech that might be offensive or unacceptable in a prep school faculty meeting, or on the floor of Congress, is tolerated in other work environments. . . . 'Title VII was not meant to — or can — change this.'"[19]

## Conclusion

With these points in mind, I would affirm the district court's decision to grant summary judgment on Herrera's hostile work environment claim.  To order an unnecessary remand on this single claim when all the other — and many far

---

[15]*Id.* at 549.

[16]833 F.2d 1406 (10th Cir. 1987).

[17]*Id.* at 1409–10.

[18]*Chavez*, 397 F.3d at 833 (quoting *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1538 (10th Cir. 1995)).

[19]53 F.3d at 1538 (quoting *Rabidue v. Osceola Ref. Co.*, 584 F. Supp. 419, 430 (E.D. Mich. 1984)).

stronger — claims have been rejected wastes court and attorney time. I would also, like the majority, affirm the district court's grant of judgment as a matter of law on Mr. Herrera's intentional infliction of emotional distress claim, his breach of contract claim, and the discovery ruling. I therefore respectfully dissent, in part.